UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF PENNSYLVANIA

FILED
WILKES-BARRE
2021 JUN -8 AM 9: 53

CLERK U.S. BANKRUPTCY COURT

| | |
|---|---|
| In Re: | ) |
| | ) |
| DELUXE BUILDING SOLUTIONS, LLC | ) Case No. 5:21-bk-00534-HWV |
| ALLEGED DEBTOR. | ) |
| | ) Chapter 7 - INVOLUNTARY |
| | ) |

*SPECIAL APPEARANCE TO MAKE THIS MOTION. BY MAKING THIS MOTION THE ALLEGED DEBTOR IS NOT WAIVING ITS RIGHT TO SERVICE OF PROCESS NOR SUBMITTING TO THE JURISDICTION OF THIS COURT OTHER THAN WITH RESPECT TO SEEKING A DISMISSAL OF THIS CASE*

## MOTION OF THE ALLEGED DEBTOR, DELUXE BUILDING SOLUTIONS, LLC, TO DISMISS THE INVOLUNTARY BANKRUPTCY PETITION WRONGFULLY FILED IN THIS MATTER

On March 18, 2021, two entities who has transacted no business with the alleged debtor, and two employees of the alleged debtor purporting to act as qualified petitioning creditors ("Petitioners") sought to commence this action by filing an Involuntary Petition for bankruptcy against the alleged Debtor, Deluxe Building Solutions, LLC (hereafter sometimes also referred to as "Deluxe" or "the Company").

Deluxe hereby moves, *pro se* through its manager, for an order (i) dismissing with prejudice the bad faith Involuntary Petition for Bankruptcy under

1

Chapter 7 filed herein, and (ii) to recover fees, costs and damages under Section 303(i) of the Bankruptcy Code for the bad faith filing of the Involuntary Petition. In support of this motion to dismiss, Deluxe states as follows:

## PRELIMINARY STATEMENT

This involuntary bankruptcy is the epitome of a bad faith filing. It is the unscrupulous brainchild of non-Petitioner Andrew Hayes, Esq., who, while acting as the debtor's in-house General Counsel, and during his on-going representation of Deluxe in multiple litigations and other matters, concocted a plan to seek personal gain and financial advantage for himself and his partners in express violation of his fiduciary duties and professional responsibilities to his client, by (directly or indirectly) persuading two employees of Deluxe and two entities who *had never transacted any business with Deluxe,* but who had done some work for a company called SyncPark USA, LLC ("Sync Park") to fraudulently falsify their invoices claiming that sums were due not from Sync Park USA, LLC (the true debtor, which was partially owned by Mr. Hayes, Mr. Wieler and their associates) but from the alleged debtor, which they *knew* were not the obligations of the debtor, and used those false claims to fraudulently file an involuntary petition against Deluxe.

As demonstrated below, the Petition is inadequate, none of the Petitioners

2

have standing to file this Involuntary Petition, this court lacks jurisdiction, there is a bona fide dispute as to Petitioners' claims, this proceeding was filed for an improper purpose, and as a result the Petition is invalid and this case must be dismissed.

## BACKGROUND

### A. The Company.

The Company is a Delaware limited liability company which was formed on August 17, 2017. See Certificate of Formation attached hereto as Exhibit "A". In 2018 the Company began operating as a construction-technology ("con-tech") start-up by seeking to incorporate technology and standardization into modular construction to seek to reduce the inefficiencies in the construction industry. From 2018 through 2020 the Company hired in excess of 120 employees. In July 2018 the Company leased office space and production facilities in Berwick, Pennsylvania from Deluxe Building Realty, LLC.

During its period of operations, from January 2018 through December 2020 the Company had sales of less than $20 million, but was operating at a loss of approximately $8 million annually. Two of its largest projects, the construction of a juvenile detention facility for the city of New York in the Bronx, and construction of a new school for the Westbury, Long Island school district, both as subcontracts to prime contractors, were terminated by the Company as a result of

3

the prime contractors' non-payment, as well as other breaches by the prime contractor, resulting in the Company and an affiliate not being able to collect on more than $7 million of receivables and contract claims, which resulted in the Company and an affiliate filing lawsuits against both prime contractors. Both of those cases are currently pending in state courts in New York.

The Company financed its losses by making capital calls on its equity holders, who contributed more than $25 million in equity capital to the Company to support its operations from 2018 through 2020. During the approximately three years of its operating existence the Company's equity holders received no distributions, and the Company's Manager, who worked full time for the Company, drew no salary and received no compensation.

**B.    The Joint Ventures –
        Modular MD LLC and
        Sync Park USA, LLC**

As Covid-19 came into the picture the Company sought to expand its offerings and entered into two joint ventures. One with Central Consulting & Contracting, Inc., a New York City based contractor engaged in conventional construction of hospitals and health care facilities, called Modular MD LLC. To date, Modular MD LLC has had no revenues.

The second joint venture was with a company called SYNCPARK, LLC, which was owned by Andrew Hayes ("Hayes") and James G. Wieler ("Wieler")

4

(and others), and controlled by Hayes and Wieler. Although Hayes and Wieler had pursued building an automatic robotic parking system based on very valuable LSM technology they had exclusively licensed from Rockwell International, over the eight (8) years they were jointly pursuing that business they had not seen any success. They had no sales, and lost their very valuable exclusive license for failure to meet the on-going requirements to maintain it. Hayes, a well educated lawyer, and Wieler, a process engineer with LSM experience, were both un-employed at the time.

On April 29, 2020 SYNCPARK, LLC and Deluxe as the two 50/50 members of that entity, entered into a Limited Liability Company Operating Agreement of Sync Park USA, LLC a Delaware limited liability company, with Frydman and Hayes designated its non-member managers, and Wieler and Hayes its "Company Executives". A copy of the Sync Park USA, LLC[1] Operating Agreement is attached hereto as Exhibit "B". (The Joint venture entity, Sync Park USA will hereafter be referred to as "Sync USA" to differentiate it from SYNCPARK, LLC, which will hereafter be referred to as "Sync Park").

Because Deluxe was in need of a qualified lawyer to act as its general counsel, and because it needed qualified process engineers, and because both were then unemployed, Deluxe also offered to hire Hayes and Wieler as employees, so

---

[1] Please note that Sync Park USA, LLC, the entity that comprised the joint venture, and was owned 50% by each of Deluxe and SYNCPARK, LLC, is not the same as "SYNCPARK, LLC" which is the Hayes and Wieler affiliate which owns 50% of Sync Park USA, LLC.

5

that while they pursued building the Sync USA business, they would have an income and contribute to the success of Deluxe and its affiliates. On April 29, 2020, Deluxe entered into separate employment agreements with each of Hayes and Wieler.

Deluxe employed Hayes as General Counsel for itself and certain of its affiliates, and Hayes agreed "to provide services as General Counsel of the Deluxe Group . . . and be a member of the Deluxe Leadership Team, in each case, utilizing Hayes's best efforts acting under the direction of, and reporting to … the Chairman of the Board of the Deluxe Group", and Hayes accepted such employment and agree[d] to devote full time and effort during the term of Hayes's employment to the business and affairs of the [Deluxe Group], all to the exclusion of engaging in any other businesses or professions other than the Joint Endeavors … and to comply and act in accordance with the policies and procedures of the Company. In consideration for Hayes's services, Hayes was paid a base salary at the rate of Two Hundred Fifty Thousand Dollars ($250,000.00) per year. A copy of Hayes' employment agreement is attached hereto as Exhibit "C".

Deluxe employed Wieler as Chief Systems Officer to the Deluxe Group and Wieler agreed "to devote full time and effort during the term of Wieler's employment to the business and affairs of the Company Parties as the Company may direct, all to the exclusion of engaging in any other businesses or professions

6

other than the Joint Endeavors ... and to comply and act in accordance with the policies and procedures of the Company Parties.... In consideration for Wieler's services, Wieler was paid a base salary at the rate of One Hundred Eighty Thousand Dollars ($180,000.00) per year. A copy of Wieler's employment agreement is attached hereto as Exhibit "D"[2].

In late 2020 the Managers of Sync USA had discussed, and were planning to change the name of Sync Park USA, LLC to iBuilt Parking, LLC.

The Sync USA Operating agreement provided, in relevant part:

*Section 2.4:*
*"The Company intends to be the vehicle for its Members through which they will jointly pursue, source, design, manufacture and build Automated Self-Park Parking Facilities using the SyncPark System throughout the United States and the World, where each member's resources and investments will be maximized."*

*Section 2.4 (d):*
*The [SyncPark] Member and the Deluxe Member desire to have a test garage built using the SyncPark System so as to prove out the SyncPark System concept (the "POC Garage"), and have formed the Company to prove out the SyncPark System, and then (i) promote, market and sell Parking Facilities incorporating the SyncPark System in Parking Facilities designed by Deluxe or its Affiliates (the "Design Services" and as more fully defined hereafter), incorporating the [SyncPark] Intellectual Property; (ii) have Deluxe manufacture the components which Deluxe and its Affiliates are capable of manufacturing (the "Deluxe Components" and as more fully defined hereafter); and (iii) have Deluxe and its Affiliates construct such Parking Facilities on property owned or leased by Parking Operators which Deluxe and its Affiliates are capable of constructing (the "Construction Work" and as more fully defined hereafter), incorporating the SyncPark System to customers sourced by the Company or Deluxe and others, including, without*

---

[2] Deluxe hereby reserves all rights and claims against Wieler, Hayes and Labanara, for breaches of their respective employment agreements and any other rights which Deluxe may have against them in law or in equity.

7

*limitation, contracts for a garage in San Ramon, CA, and a proposed 100-car garage at 335 Broome Street, New York.*[3]

**Section 2.4 (e):**
*The Members' Initial Capital Contributions:*

(i)     *Subject to its reversionary right upon termination (as set forth hereafter or in a separate agreement regarding the tax-efficient ownership structure for the joint venture's intellectual property), the [SyncPark] Member hereby Transfers and assigns to the Company all of its rights, title and interest in and to the SP Intellectual Property, the MagneMotion IP, and all of the other assets currently owned by the [SyncPark] Member, inclusive of all licenses, technologies and intellectual property of the [SyncPark] Member (the "[SyncPark] Assets"), free and clear of all liens and encumbrances, to have and to hold same (free and clear of all liens, encumbrances, etc.), in perpetuity, with full and free right to sublicense or assign any or all of same, in exchange for FIFTY PERCENT (50%) of the Membership Interests in [Sync USA].*

(ii)    *The Deluxe Member hereby makes an in-kind contribution of (i) a space in one of its buildings in Berwick Pennsylvania which is capable of housing the parking facility to be the "proof of concept" garage as mutually agreed to by the parties (the "POC Garage") for such period as required for proof of concept (the "POC Term"); (ii) the Design Services to design the necessary steel superstructure needed for the POC Garage; (iii) the steel superstructure designed for the POC Garage and any other Deluxe Components, inclusive of materials, fabrication and assembly; (iii) the Construction Work necessary to construct the POC Garage; and (iv) its written commitment to fund necessary purchases of LSM motors and related equipment that Deluxe cannot manufacture, and to pay for such engineering work that Deluxe is not able to provide, as necessary for the POC Garage and in accordance with the Deluxe Commitment described infra at Section 3.3 (c), **and funded in accordance with the Approved Budget**[4]; and (v)*

---

[3] The Broome Street project was a project Andrew Hayes had "brought-in" to kick off the Sync USA business, and one of the reasons Deluxe agreed to join as a member. However notwithstanding Mr. Hayes' assurances about this project he was unable to close the deal and bring in the business.

[4] Had the Company Mangers timely presented an annual budget which was approved by the Board, Section 3.3 (c) of the Sync USA Operating Agreement provided the "nature and extent" of the Deluxe undertaking as providing funds for the purchase of "LSM motors and related equipment that Deluxe cannot manufacture, and payment for such engineering work that Deluxe is not able to provide necessary for the prompt completion of the POC Garage . . . with

8

the personnel necessary to construct, install, operate and maintain the POC Garage during the POC Term, in exchange for FIFTY PERCENT (50%) of the Membership Interests in the Company.

**Section 3.12:**Liability. *Except as otherwise provided by the Act, the debts, obligations and liabilities of [Sync USA] and its Subsidiaries, whether arising in contract, tort or otherwise, **shall be solely the debts, obligations and liabilities of [Sync USA] or a Subsidiary, and no Manager, Member, Principal or their respective Affiliates (collectively "Covered Person") shall be obligated personally for any such debt,** obligation or liability of [Sync USA] or a Subsidiary solely by reason of being a Covered Person.(Emphasis Added).*

**Section 6.1:** *(a) Except for situations in which the vote, consent or approval of one or more Members is expressly required by this Agreement or by non-waivable provisions of Applicable Law, all of the powers of [Sync USA], and all the business and affairs of [Sync USA] and its Subsidiaries shall be managed under the direction of a Board of Managers (the "Board"); and each member thereof being referred to as a ("Manager")...*

*(b) ... the size of the Board shall initially be fixed at Two (2) Managers, with one (1) Manager designated by the Deluxe Member [Frydman], and one Manager designated by the [SyncPark] Member [Hayes].*

*(c) ... **any action taken by the Board may only be taken with the approval, either in writing or at a duly called meeting of Managers holding a majority of the votes held by the Managers then serving on the Board.** ... (Emphasis added).*

*(b) . . .Subject to the terms hereof and subject to the direction of the Board, **the day-to-day management of [Sync USA] shall be vested in Hayes and Wieler** ... (each a "Company Executive", and collectively the "Company Executives"), **who shall be responsible for the day-to-day operations of [Sync USA] and the implementation of, and execution of, the business plans of [Sync USA]**, at the expense of [Sync*

---

the precise amount to be as set forth in the 2020 Approved Budget, as approved by the Board, and funded in accordance with the Company's 2020 Approved Budget, and on or prior to the date called for same by the Board, up to but not exceeding" $500,000, with a target not to exceed $250,000, but only if Sync USA has not received deposits and advances from customers or accessed loans or lines of credit at commercially reasonable rates instead of obtaining funding from Deluxe. (Emphasis added).

9

*USA], **in each case pursuant to and in accordance with the Approved Budget as in effect from time to time prepared by the Company Executives and approved by the Board.** (Emphasis added).*

*(e) Business Plans and Budgets. The Board shall approve **an initial Business Plan and Operating Budget through December 31, 2020, prepared by Company Executives and submitted to the Board for approval by May 15, 2020. Once approved by the Board, said Operating Budget shall be deemed the Approved Budget and Business Plan for the Company through December 31, 2020. Commencing November 15, 2020 with respect to calendar year 2021, and on each November 15 thereafter with respect to each following calendar year, the Company Executives shall prepare and present to the Board their proposed Business Plan and Operating Budget for such following calendar year** (including any proposed capital projects, as part of the Business Plan). The Board shall review each such proposed Business Plan and Operating Budget and shall either approve same, or provide the Company Executives with its comments and suggestions, in which case the Company Executives shall revise the proposed Business Plan and Operating Budget in accordance with the comments and suggestions of the Board and re-submit a revised Business Plan and Operating Budget within ten (10) days for further consideration by the Board, and this process shall continue until the Business Plan and Operating Budget is approved by the Board **(as so Approved by the Board, the "Approved Business Plan" and "Approved Budget").** (Emphasis added).*

**Section 6.5:** *(e) Any action required or permitted to be taken at any meeting of the Board ...may be taken without a meeting if a consent in writing, setting forth the action so taken, is signed by Managers holding the requisite number of the votes held by the Managers then serving on the Board .... Prompt notice of the taking of an action without a meeting by less than unanimous written consent shall be given to those Managers who have not consented in writing. A Manager who does not participate in any such meeting may approve any matter in writing or by email.*

**Section 6.8:** *...[Sync USA] shall not, and shall not permit any of its Subsidiaries to, engage in or cause any of the following transactions or take any of the following actions, and the Board shall not permit or cause [Sync USA] or any of the Subsidiaries to engage in, take or cause any*

10

*such action, except with the **Unanimous prior approval of all of the Managers then serving on the Board**:... (h) **except as may be set forth in any Approved Business Plan or Approved Budget, the incurring of any debt obligations by [Sync USA]** (Emphasis Added).*

**Section 12.26** *Time of Essence. **Time is of the essence with respect to all matters contained in [the Sync USA Operating] Agreement.***

As is clear from the above quoted provisions of the Sync USA Operating Agreement: (i) any obligation incurred by the Sync USA entity is an obligation of *that entity*, not of any of its members (Sec. 3.12); (ii) that any sums expended by the Sync USA entity can only be pursuant to an Approved Budget or by the unanimous vote of the Board of Managers (Sec. 6 (b) and 6.8 (h)); and (iii) that it was the responsibility of Wieler and Hayes, as the Company Executives, to timely prepare and present to the Board of Managers of Sync USA the 2020 Annual Budget and Business Plan to be presented by May 15, 2020; and the 2021 Annual Budget and Business Plan to be presented by November 15, 2020, to the Board for its approval (or comments) (Sec. 6 (e)), time being of the essence (Sec. 12.26).

Notwithstanding their contractual obligations to prepare and present annual budgets for the day-to-day operation of the Sync USA business,

11

neither Wieler nor Hayes had timely presented either the 2020 Budget which was to be presented by May 15, 2020 nor the 2021 Budget which was to be presented by November 15, 2020, and as such they had no authority to spend the funds of, or incur obligations on behalf of, Sync USA for any purpose not in an approved budget nor otherwise approved by the Board.

But that is not what happened. In violation of their contractual undertakings, Wieler and Hayes violated the referenced provisions of the Sync USA Operating Agreements by wrongfully contracting for services not in any approved budget and incurring obligations on behalf of Sync USA for which they could have personal liability under the indemnity provisions and potentially liquidated damages.

To evidence that Wieler and Hayes failed to meet their obligations as Company Executives to prepare and timely submit annual business plans and budgets to the Sync USA Board, attached hereto as Exhibit "E" is the last incomplete draft of the 2020 Business Plan and Budget submitted to the Board which is marked: "Rev 3" and dated July 28, 2020, more than 60 days beyond its deadline and which, as of March 19, 2021 was still not

12

completed and still not approved by the Board; and attached hereto as Exhibit "F" is an email dated December 31, 2020 from Mr. Wieler to Frydman and copied to Mr. Hayes, submitting the first draft of the 2021 Budget, recalling that Frydman had asked about it in November when it was around two weeks late, and accompanied by the as then still incomplete 2020 Business Plan and Budget, which Mr. Wieler references in said e-mail; and attached as Exhibit "G" is the first draft of the 2021 proposed Budget and Business Plan, which was submitted on December 31, 2020, more than 45 days after is due date, and which, as of March 19, 2021 was still not submitted to the Board nor approved.

During the entire period from April 29, 2020 through March 19, 2021 there was no meeting noticed or held of the Sync USA Board, and there has not been any action taken by the written consent of the Board of Managers of Sync USA (these being the only two ways the board can act) (See declaration of Frydman attached as Exhibit "I" hereto).

Since there were no approved Budgets, and since there were no requests made for a Board vote for expenditures not within an approved budget pursuant to Sec. 6.8 (h), neither Wieler nor Hayes had any

authority to expend funds nor contract for any goods or services on behalf of the Sync USA Entity. Indeed, if any funds were expended by Mr. Hayes or Mr. Wieler without such approval then pursuant to Section 6.8 (h) of the Sync USA Operating Agreement that would constitute an express breach of the Agreement, and could subject them to indemnification obligations (under Sec. 7.10[5]) and certain special and liquidated damages (Sec. 11.1 (d)[6]).

Yet, notwithstanding the express prohibitions on the expenditure of funds by Sync USA, Wieler and Hayes admit in writing that they breached their agreements to not incur obligations not in an approved budget or otherwise approved by the Board. A review of Exhibit "G" includes their admission that:

> *"We have incurred approximately $125,000 in engineering costs as of the end of 2020."*(see Sec. 6 of Ex. "G").

---

[5] Which provides: "a Member shall be obligated to indemnify the Company for any costs, damages or other expenses incurred by the Company as a result of the unauthorized action of such Member, its Principals or any officer, employee or agent of such Member."

[6] Which provides: "The Parties agree that in the event of a breach by a party of any covenant contained in this Agreement, actual damages would be difficult or impossible to ascertain, and that therefore, each single occurrence which may be considered a breach of any covenant contained in this Agreement shall require the imposition of a liquidated damage award in favor of the non-breaching party in the amount of fifty thousand dollars ($50,000) per violation increasing by Twenty Thousand dollar ($20,000) on each anniversary of the date of the execution hereof, which the Parties agree is not a penalty, and which represents a reasonable liquidated damage per violation."

14

This admission is a clear breach of the terms of the Sync USA Operating Agreement. However, pursuant to the terms of the Sync USA Operating Agreement, any such incurred expense, which is a violation of section 6.8 (h) of the Agreement would subject Mr. Wieler and Mr. Hayes to liability under Section 7.10 and Liquidated Damages under section 11.1(d). So they sought to conceal their breaches.

Even more disturbing, is that a review of Exhibit "E" reveals that the breaches which Mr. Wieler and Mr. Hays were seeking to conceal, and the expenditures which they were un-authorized to expend were for services to be performed, NOT FOR THE ALLEGED DEBTOR, but persons Mr. Wieler and Mr. Hayes wrongfully hired ***as contractors for Sync USA,*** which are the ***two other Petitioners in this Involuntary Petition!***

Under the "BUSINESS PLAN MATTERS" section of the Sync USA Draft 2020 (un-approved) Business Plan (Exhibit "E") Mr. Wieler and Mr. Hayes write: "Establish a Plan for Designing and Prototyping the Sync Park Garage, and as to same establish a SCHEDULE and BUDGET for …

*4.3 Power Distribution/LSM Cabinet Design*
***Superior Controls*** will specify and design the power distribution system and the IP-65 cabinet design. The cabinets will be designed such that all

wiring connections within one module will be contained within the module.

### 5.2 Programmable logic controller

**Superior Controls** will be the contractor that we will use for integrating third party hardware and our parking traffic control software. They have been selected because they were lower cost than the other alternative and come highly recommended by **MagneMotion.**

The programmable logic controller will provide control of all hardware including the **MagneMotion** LSMs and third-party hardware such as car scanning devices and liftgates.

### 6.0 Build - Test Stand

The plan is to build a two-space engineering test stand with a tug aisle in North Hampton New Hampshire which is within one hour of **MagneMotion,** the engineers can daily. **Superior controls** have a local office within 10 minutes of North Hampton, and **Taylor [&] Peterson** have an office within 1/2 hour of North Hampton.

The Court will likely recognize the references to ***Superior Controls*** and ***Taylor & Peterson***, who together with Mr. Wieler and Robert Labanara make up the four Involuntary petitioning creditors. However the Court may not recognize "***MagnaMotion***". That is because MagnaMotion is actually a "project" of Taylor & Peterson. Attached hereto as Exhibit "H" is a screen shot of two pages of the Taylor & Peterson Web Site at http://taylorandpeterson.com/ . On the "Projects" page, Taylor & Peterson describe the MagnaMotion project as:

*"MagneMotion provides electro-magnetic solutions for the assembly automation, material handling, and transportation industries for the fast, safe, clean, and efficient transport of goods and people. The Company's patented Linear Synchronous Motor (LSM) technology offers the most advanced solutions available to the many industries it serves. The scalable nature of*

16

*MagneMotion's LSM technology allows for the development of transport and positioning systems that handle payloads ranging from ounces to tons, in virtually any environment".*

## C.    Petitioners.

The Involuntary Bankruptcy petition in this case was filed by four petitioners, none of whom qualify as legitimate petitioners with standing necessary to file an involuntary petition against the alleged debtor.

In addition to Mr. Wieler, Superior Controls and Taylor & Peterson, Robert Labanara is our fourth petitioner. Like Mr. Wieler and Mr. Hayes, Mr. Labanara was employed by the alleged debtor as a Business Development Consultant to the Company and certain of its subsidiaries and affiliates in each case, utilizing his best efforts acting under the direction of the Company's Board. Mr. Labanara accepted such employment, and agreed to devote full time and effort during the term of his employment to the business and affairs of the Company Parties ... all to the exclusion of engaging in another business or profession. In consideration for Mr. Labanara's services to the Company, he was paid: (i) a base salary ("Base Salary") at the rate of Two Hundred Twenty Five Thousand Dollars ($225,000.00) per annum; and (ii) a commission on sales made and payable in accordance with the Sales Policy of the Company[7].

---

[7] While it is the Alleged Debtor's belief that neither Mr. Wieler nor Mr. Labanara can qualify as Involuntary Petitioners because they are employees and insiders of the Alleged Debtor, Deluxe has not addressed the issue of their claims. Deluxe wishes to put on the record that as to Mr. Labanara Deluxe disputes the amount of his claim; and as to Mr. Wieler, Deluxe is unable to determine at this time whether he is due any sums from Deluxe, as his claim is based on

## D.    The Covid 19 Furloughs.

By the end of 2020 it became obvious that Deluxe, saddled with significant payables, which could only be paid when it collected its even more significant receivables, which Deluxe believed (and continues to believe) will generate more cash than the amount needed to cover all un-disputed claims, could not continue operating until those receivables were collected. However, those collection efforts had been needlessly delayed as a result of Covid and the New York court system effectively shutting down. Both lawsuits were filed in early 2019, over two years ago, and have still not had a trial date set.

In December 2020 it was decided that Deluxe would cease its operations at year end, and continue to pursue its valuable receivables in litigations which was overseen by Mr. Hayes as General Counsel, so that the Company could collect what it believed would be in excess of $7 million, and use those funds to clean-up its debt.    At its peak Deluxe employed over 125 employees. Although the Company ceased to operate its business as of December 31, 2020, it continued to employ less than 20% of that workforce through March 2021[8].

By February of 2021 many of the 125 Deluxe employees were either furloughed or laid-off. Mr. Wieler was furloughed on January 4, 2021. Mr.

---

unreimbursed expenses, which Deluxe believes are the obligation of Sync USA, and not Deluxe, but requires discovery to make that determination.

[8] In late 2020 the members of Deluxe determined that they could no longer support the Deluxe business, and agreed to hire any remaining Deluxe employees commencing in April 2021 through a separate entity which they owned called "iBuilt Group, LLC".

18

Labanara was furloughed on February 8, 2021. During this period Frydman had contacted Hayes to explain that the Company could no longer afford to pay him a Quarter of a Million dollars a year, and that the nature of the relationship would need to change. On March 15, 2021 Mr. Hayes wrote an email to Mr. Frydman stating:

> "I've agreed to continue working on your various matters for up to 30 days, solely and specifically in an outside-counsel capacity, so your interests can be protected as you work to find other counsel to substitute in. I will do that work on an hourly-rate basis, with payment to be made at some point in the future, when it's possible for you to do so (including, specifically, from any proceeds of settlements or other recoveries in your pending matters). I've advised you that my regular rate for my other clients is $600/hr, but as an incentive to make payments within 90 days, I'll take a discounted rate of $500/hour." (See Exhibit "J" attached hereto.)

It is Deluxe's belief that the furlough of Messrs. Wieler and Labanara from their very lucrative high-paying jobs, and Mr. Hayes's realization that his quarter of a million dollar a year retention had ended caused these three to concoct a plan to "get-back" at Deluxe and its Manager, and that this bad-faith Involuntary Petition was the most egregious retaliation they could dream up.

**D.    The Endurance Insurance Claim and the
         First Capital Bankruptcy Scheme.**

Prior to becoming Manager for Deluxe, Mr. Frydman was the C.E.O., Chairman and Chief Investment Officer of a public Real Estate Investment Trust which he formed and took public in 2012, and sold in 2015 (the "REIT"), and the Chairman of Cabot Lodge Securities, a FINRA Member Broker Dealer with 125

offices nationwide and $1.5 Billion under management which Mr. Frydman founded and grew. Mr. Frydman's affiliates sold the private advisor that managed the REIT in 2015 and the FINRA Member Broker Dealer in 2016. As part of the sale of the REIT advisor, Mr. Frydman required that the purchaser provide him and the other officers and directors of the REIT with a 6-year tail Director's & Officers Insurance Policy to protect them in the event the new buyers did anything which could draw the prior executives into claims or litigation. The Purchasers complied, and provided a "Primary Management Liability Insurance for Public Companies" policy, no. FIP10007615700 (the "Policy"), written by Endurance American Co. effective as of August 14, 2015 through September 15, 2020, with a policy limit of $5,000,000, for the benefit of the publicly-traded REIT and its directors and officers, which at the relevant time included Frydman. As detailed in the complaint filed by Mr. Hayes against Endurance Insurance on behalf of Mr. Frydman, which was filed on or about December 9, 2020 in the U.S. District Court for the Southern District of New York, (a copy of which is attached hereto as Exhibit "K"), Mr. Frydman incurred over $2.2 million in legal fees and other expenses in connection with an investigation of the new buyer's activities by the Securities Exchange Commission from June 2016, and through November 2019, gave timely notice of the investigation to Endurance, provided additional information as requested, submitted copies of invoices from counsel retained for that investigation, and then

demanded reimbursement of those funds. Unfortunately Endurance refused to honor the policy and reimburse those expenses, which is why the lawsuit was filed.

The Endurance insurance policy had a $500,000.00 deductible, unless the REIT was "impaired". The concept being that if the REIT or its advisor was financially able to indemnify the officers and directors covered under the policy, the first $500,000.00 loss would be covered by them. However, if the REIT and advisor were "impaired", then there would be no deductible and the insurance company would be obligated to cover the first $500,000.00 loss as well.

Mr. Hayes researched the "impairment" requirement and concluded that the bankruptcy of the REIT or advisor would constitute "impairment". In February 2021 Mr. Hayes concocted a scheme – he suggested that if we were to put the REIT and/or the advisor into an involuntary bankruptcy, then that would be prima facia "impairment" and Endurance would need to cover the otherwise deductible $500,000.00. Because an affiliate of Frydman held a judgement against the REIT advisor and 12 other debtors, and Frydman and other affiliates of Frydman had additional claims against them, he would prepare an involuntary petition against them, and use that as the basis for overcoming the "impairment issue".

On February 22, 2021 Mr. Hayes asks Frydman to send him a copy of the judgment, which Frydman sent, and then on the same day Mr. Hayes sends Frydman an email thanking him for a link to the judgment, and attaches Form 205

titled "Involuntary Petition Against a Non-Individual" and states "attached is the form you will need to fill out to initiate the case."

Frydman was not comfortable using the bankruptcy court for this purpose, and asked Mr. Hayes to research whether anyone can simply throw someone else into involuntary bankruptcy, were there restrictions, and were there potential consequences. Hayes agreed to undertake this research, and on February 26, 2021 sent Frydman a subsequent email with the subject: "First Capital Chapter 11 filing" pushing Frydman to review the draft petition which he prepared for the First Capital Bankruptcy filing. A copy of Mr. Hayes' email is attached hereto as Exhibit "M".

Although Hayes assured him that his research revealed no concerns, and was pushing Frydman to 'just go ahead and file the involuntary petition', Frydman was still not satisfied as he did not get any memo back from Hayes on the issues he expressly asked be researched. Frydman refused to review or sign any involuntary petition against another unless he had the legal basis for doing so without negative consequences. Frydman instructed Hayes to undertake additional research and report his findings.

On March 9, 2021 - *TEN DAYS PRIOR TO THE FILING OF THE INVOLUNTARY PETITION IN THIS CASE* – Hayes sent Frydman an email, a copy of which is attached hereto as Exhibit "N". The subject of that email was:

"Need to reach out to others that Singal defrauded before filing him in bankruptcy", and Hayes attached a copy of the court's decision in _Wilk Auslander LLP v. Murray (In re Murray)_, 900 F.3d 53 (2d Cir. 2018). A copy of said attachment is attached hereto as Exhibit "O". Mr. Hayes' email stated:

> "Hi Jacob,
>
> My initial search was too narrow. The attached Second Circuit decision joins a growing trend of bankruptcy courts dismissing even technically correct petitions when the real purpose of the petition is to collect on a judgment, instead of "protecting the community of creditors" of the debtor.
>
> That said, if you can team up with two other of Singal's victims, who also have claims against him and the business, then you can definitely file a petition against him.
>
> Andrew"

Notwithstanding Mr. Hayes' assurances to the contrary, after reading the _In re Murry_ decision, Frydman informed Hayes that he would not file an involuntary petition against Singal, First Capital or anyone else, as the same would not constitute a legitimate purpose or use of the Bankruptcy Court. Hayes was very upset by Frydman's decision.

## E. The Unscrupulous Conspiracy.

At about the same time Hayes and Wieler were getting pressure from Superior Controls and Taylor & Peterson to pay invoices which they had inappropriately incurred on behalf of Sync USA as above detailed. On information

23

and belief, Deluxe asserts that when Frydman rejected Haye's concocted scheme to effect an "impairment" with respect to the Endurance Insurance matter, Hayes reached out to Wheeler and conspired to get Labanara involved as well as sourcing two other creditors. Because they knew that they had wrongfully incurred obligations on behalf of Sync USA – which they might have to cover out of their own funds (not to mention be liable for liquidated damages), it is Deluxe's contention that Hayes and Wieler caused Superior Controls and Taylor & Peterson to join with them in this conspiracy by issuing invoices which ON THEIR FACE ARE CLEARLY NOT THE OBLIGATIONS OF DELUXE – but rather, based on the clear and unambiguous descriptions of the work done as stated in those invoices – were the obligations of Sync USA – not the alleged debtor, and use those false and fraudulent invoices as the basis for filing an involuntary petition against Deluxe.

There can be no doubt that during this exact time frame Hayes was focused on and engrossed in his scheme to put First Capital into involuntary bankruptcy to give him an advantage in the Endurance litigation. There can be no doubt that when Frydman rejected Hayes' scheme that Hayes was upset, especially because the quarter million dollars per year that he was happily receiving had stopped, and because he was concerned about his 50% interest in Sync USA, and wanted to find

24

a way to take Deluxe's 50% interest away[9]

A review of the January 4, 2021 Taylor & Peterson Invoice, a copy of which is attached hereto as Exhibit "R", which is one of the two entity claims in this Involuntary Petition states on its face who the work was done for, and who should be obligated to pay. It states: ***"Design of turntable and elevator for SyncPark product, general consulting on same"***. How that can miraculously morph into an undisputed claim owed by Deluxe is simply beyond comprehension.

Similarly, a review of the Superior Controls invoices supporting the only other non-employee claim in this involuntary petition, reveals the same inexplicable morphing of a Sync Park invoice into an undisputed claim owed by Deluxe. A review of the Superior Control invoices, a copy of which is attached hereto as Exhibit "P" lists what was done to generate the obligations. Those invoices state, unambiguously, that the debts were incurred:

- *On Description: Quote # 6/29/20 (200635) proposal PLC programming, cabinet design Equivalent of 8 weeks engineering for design effort, cabinet design, power system design and scoping for PLC programming;*
- *Review Heat calculations with Andrew;*
- *Communcation [sic] between MATLAB and Server;*
- *Finalizing the MATLAB-PLC connection through KEPServerEX and seeing if connection possible through Rockwell server products;*

---

[9] It is beyond the scope of this motion to address Hayes' and Wieler's attempts to steal the 50% which Deluxe owned in Sync USA for themselves, but there is ample evidence to prove that in addition to all the other wrongdoings then being concocted by Hayes and Wieler and their co-conspirators, it was Hayes and Wieler's intent to deprive Deluxe of its interest in a company which might some day create value. Deluxe and its principals reserves the right to seek damages against these bad actors in separate actions in other courts.

- *Network and MC Layout drawings;*
- *Finalize information on Kinetix PS and 3ph 24VDC PS Meet with Jim;*
- *Meeting with Jim and Dick to discuss control architecture and parking module layout;*

Clearly, these are not the obligations of the alleged debtor, but rather of Sync USA. Indeed James Wieler admits this is writing in his email to Stephen Ludwig, Deluxe's CFO, which was copied to both Mr. Hayes and Mr. Frydman, a copy of which is attached hereto as Exhibit "Q". Contrary to his now highly suspicious assertion that these are the obligations of Deluxe, he admitted in writing, when he wrote, on December 28, 2020:

> *"Has any payment been made to the* ***SyncPark subs?*** *They are* ***Superior Controls,*** *Mathematical Analysis Co., and* ***Taylor and Peterson****. There are invoices from August that must be paid. We are at risk of losing some expertise that is critical to our success. Please send me an update."*

Based on the foregoing, can there be any doubt that the claims asserted by Superior Controls and Taylor and Peterson are NOT legitimate undisputed claims of the alleged debtor?

**F.     Lawyers abusing the Bankruptcy Court.**

It would be bad enough if the improperly filed Involuntary Petition ware filed by un-informed and poorly advised lay persons, who would nonetheless be liable for their purposeful or negligent abuse of the Bankruptcy system.  But this case is

26

significantly more sinister. It isn't the lay co-conspirators that dreamed up this fraud, it is two licensed attorneys – one of whom was SIMULTANEOUSLY REPRESENTING DELUXE and its affiliates in numerous litigations, that Deluxe asserts, on information and belief, concocted this scheme to defraud the Bankruptcy Court while killing the prospect that Deluxe or its creditors and equity holders would ever recover any money. This is nothing less than a diabolical plot by two lawyers who, in spite of their fiduciary duties, duties to act honestly with the court, and in violation of their professional responsibilities and ethical obligations, simply decided to put the nail in the Deluxe coffin, without regard to legitimate claim holders and cost its equity holders more than a $25 million loss. This was purposeful and intentional!

Not 10 days before the filing of the bad-faith Involuntary petition in this case, Hayes presented Frydman with his findings in the <u>Murry</u> case. (see Exhibit "O" attached). Hayes is a Columbia University Law School Graduate, who holds an LLM degree from Harvard Law School, worked with some of the country's best law firms, and would be expected to conclude, from reading the Murry decision and his other research, that bringing the instant involuntary Petition would constitute a bad faith filing.

So he wanted, (and because he was also simultaneously acting as counsel for the alleged debtor, needed) to conceal his conspiracy and involvement, so on

27

information and belief, Deluxe asserts that Hayes sought out Harry Lewis, an obviously less well educated lawyer with equally despicable ethics and morals, willing to abuse the Bankruptcy system for his legal fees.

**G.    Doubling Down on their Fraud.**

Assuming that the filing of the involuntary petition was not an intentional act of bad faith, but a negligent act, one would assume that if the lawyers representing the petitioning creditors were made aware of the fact that there were no legitimate undisputed claims asserted by the Petitioners, in the interests of justice, the lawyers would do anything in their power to right their wrongs.  But not Harry Lewis.

Mr. Lewis and each of the four petitioning creditors certified under penalties of perjury, on the face of the Involuntary Petition, that "***I have examined the information in this document and have a reasonable belief that the information is true and correct***" (Emphasis added, see part 4 of the petition). Moreover each Involuntary petition form states on its face, just prior to the petitioners' and lawyers' signatures:

> ***WARNING -- Bankruptcy fraud is a serious crime. Making a false statement in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.*** (Emphasis added, see part 4 of the petition).

Harry Lewis was advised by Frydman within days of the filing of the bad

faith petition of his errors. On March 24, 2021, Mr. Frydman sent a lengthy email to Mr. Lewis advising him, among other things, that the claims asserted were not legitimate. That neither employees of the debtor, nor creditors with disputed claims were eligible to file an involuntary petition, and reminding him of Sections 156 and 157 , which state:

### §156. Knowing disregard of bankruptcy law or rule

*(a) Definitions.—In this section—*

*(1) the term "bankruptcy petition preparer" means a person, other than the debtor's attorney or an employee of such an attorney, who prepares for compensation a document for filing; and*

*(2) the term "document for filing" means a petition or any other document prepared for filing by a debtor in a United States bankruptcy court or a United States district court in connection with a case under title 11.*

*(b) Offense.—If a bankruptcy case or related proceeding is dismissed because of a knowing attempt by a bankruptcy petition preparer in any manner to disregard the requirements of title 11, United States Code, or the Federal Rules of Bankruptcy Procedure, the bankruptcy petition preparer shall be fined under this title, imprisoned not more than 1 year, or both.*

### §157. Bankruptcy fraud

*A person who, having devised or intending to devise a scheme or artifice to defraud and for the purpose of executing or concealing such a scheme or artifice or attempting to do so—*

*(1) files a petition under title 11, including a fraudulent involuntary petition under section 303 of such title;*

*(2) files a document in a proceeding under title 11; or*

*(3) makes a false or fraudulent representation, claim, or promise concerning or in relation to a proceeding under title 11, at any time before or after the filing of the petition, or in relation to a proceeding falsely asserted to be pending under such title, shall be fined under this title, imprisoned not more than 5 years, or both. (see copy of email to Mr. Lewis attached as*

29

Exhibit "S" attached hereto).

Obviously that did not deter Mr. Lewis nor Mr. Hayes. Instead, fearing that the alleged debtor might move to dismiss the petition, rather than take any corrective actions, he elected to double down on his fraud. Deluxe asserts that on April 20, 2021, among his numerous other falsehoods, Mr. Lewis knowingly and fraudulently asserted under penalties of perjury, declaring same to be true and correct:

> On April 19, 2021, undersigned counsel received a report that the principal of the alleged debtor, Jacob Frydman, was engaged in negotiations for a liquidation [sic] sale or sales of assets of the debtor and/or its affiliates.
>
> Entry of the Order for Relief on an expedited basis therefore has become urgent.
>
> Wherefore, pursuant to Fed. R. Bankr. P. 1013(b), the petitioning creditors move the court to expedite entry of the Order for Relief in this case.

Mr. Lewis is willing to throw out broad unsupported unspecific allegations. He does not identify what assets, who they belong to, where they are located, who is the counterparty that is negotiating the purchase. No he simply issues an unsupported assertion with no specifics. Certainly if Mr. Frydman was negotiating any sale of any of the alleged debtors assets he would know about it. However, as stated in Mr. Frydman's declaration attached hereto as Exhibit "I", Frydman was not involved in

30

any negotiation of the liquidation of any assets the alleged debtor as asserted by Mr. Lewis. And Frydman is unaware of anyone else who was so involved. Therefore, there can be only two possibilities: (i) Mr. Lewis knows more about these assets and negotiations than the person he asserts is undertaking them, or (ii) he is lying. The alleged debtor hereby demands that Mr. Lewis disclose this "report", identify the parties to the negotiations and identify the assets, as we believe this is yet a further fraud on this court in order to ram-rod these proceedings. Based on Mr. Lewis' fraudulent assertions, the Court was persuaded to enter an expedited order for relief.

**H.   Mr. Lewis' litany of additional fraudulent misrepresentations to this court.**

Mr. Lewis' fraudulent misrepresentations in his under-oath, subject to penalties of perjury affirmations went way beyond the false statement about the liquidation of the alleged debtors assets.   Mr. Lewis has also knowingly, or recklessly, also defrauded this court with respect to his statements that:

> *On March 25, 2021, Pennsylvania Constable Samuel Spigelmeyer served the involuntary petition on the alleged debtor through its agent for service of process in Harrisburg as noted in the certificate of service annexed to the petition and filed with this Court.*
>
> *Pursuant to Fed. R. Bankr. P. 1013, April 15, 2021 was the deadline for response to the petition.*
>
> *As of today's date, the alleged debtor has defaulted.*

In fact, as of this writing, the alleged debtor has not yet been served, and therefore

31

cannot have defaulted. Rule 1010 titled "Service of Involuntary Petition and Summons" sets forth the service requirements as follows:

> (a) *Service of Involuntary Petition and Summons. On the filing of an involuntary petition, the clerk shall forthwith issue a summons for service. When an involuntary petition is filed, service shall be made on the debtor. The summons shall be served with a copy of the petition in the manner provided for service of a summons and complaint by Rule 7004(a) or (b). If service cannot be so made, the court may order that the summons and petition be served by mailing copies to the party's last known address, and by at least one publication in a manner and form directed by the court. The summons and petition may be served on the party anywhere. Rule 7004(e) and Rule 4(l) F.R.Civ.P. apply when service is made or attempted under this rule.*

The applicable provisions of Rule 7004 titled "Process; Service of Summons, complaint" states:

> (b) *Service by First Class Mail. Except as provided in subdivision (h), in addition to the methods of service authorized by Rule 4(e)–(j) F.R.Civ.P., service may be made within the United States by first class mail postage prepaid as follows:. . .*
>
> (3) *Upon a domestic or foreign corporation or upon a partnership or other unincorporated association, __by mailing a copy of the summons and complaint to the attention of an officer, a managing or general agent, or to any other agent authorized by appointment or by law to receive service of process and, if the agent is one authorized by statute to receive service and the statute so requires, by also mailing a copy to the defendant.__ (Emphasis added).*

A review of the alleged debtor's Certificate of Formation filed in the state of Delaware, a copy of which is attached hereto Exhibit "A", reveals that the alleged debtor is a Delaware limited liability company formed on August 17, 2017, and that

32

"The address of its registered office in the State of Delaware is 1013 Centre Road, Suite 403-B in the City of Wilmington, Delaware 19805, in the County of New Castle. The name of its registered agent at such address is V corp Services, LLC."

Constable Spigelmeyer's certificate of his first attempted service was filed with the court as Document 8 purporting to be his certificate of service on March 28, 2021. However his first attempt was faulty, as the clerk of court identified in Doc 9, a copy of which is attached hereto as Exhibit "V", wherein the Clerk admonishes Mr. Lewis as follows:

> *Please take notice that: There was a discrepancy noted between the data entered in CM/ECF and what is shown on the pdf image attached to docket entry #9 . The document filed to Doc. 9 appears to be a duplicate of the filing at Doc. 1.. Failure to refile or amend your document may result in a delay in processing this matter.*

The Clerk's notice that service was improper is dated March 29, 2021.

One must question, if Mr. Lewis was noticed on March 29, 2021 that the first attempt at service failed, how is it that the second attempt, which "allegedly" occurred FOUR DAYS EARLIER is possible. One must wonder if a Summons issued on March 19, 2021 and only valid for seven (7) days and would expire on March 26, 2021, how that same summons could be used to effect service thereafter? Moreover, a review of the docket shows that the "second" certificate of service was not filed until March 30, 2021, or more than 21 days after the issuance of the

Summons, and therefore how could that possibly constitute effective service. Moreover, Rule 7004 (e) provides:

> *"(e) SUMMONS: TIME LIMIT FOR SERVICE WITHIN THE UNITED STATES. Service made under Rule 4(e), (g), (h)(1), (i), or (j)(2) F.R.Civ.P. shall be by delivery of the summons and complaint within 7 days after the summons is issued. If service is by any authorized form of mail, the summons and complaint shall be deposited in the mail within 7 days after the summons is issued. If a summons is not timely delivered or mailed, another summons shall be issued and served. This subdivision does not apply to service in a foreign country.*

Fortunately, the Court will not need to undertake such an inquiry, as the second certificate of service is also defective on its face, and by virtue thereof the alleged Debtor has not yet been served. To properly effect service under the service requirements of Rule 7004 Constable Spiegelmeyer would do so ***"by mailing a copy of the summons and complaint to the attention of an officer, a managing or general agent, or to any other agent authorized by appointment or by law to receive service of process and, if the agent is one authorized by statute to receive service and the statute so requires, by also mailing a copy to the defendant.***

Constable Spigelmeyer, in his March 30, 2021 certificate of service certifies that he did neither. Instead he asserts that he "handed" the summons to "Ginger Bennett (female @50 of age) Grey Hair, 5 ft. 8 in. tall" at CT Corporation System 600 North 2nd St. Suite 401 Harrisburg, PA 17101."

34

Neither Mr. Lewis nor Mr. Spigelmeyer explain how this constitutes service on Deluxe, as it cannot.

It is the Alleged Debtor's understanding that it has 21 days from service of the summons to file an answer or this motion (but that time frame can be extended if the service requirement is out side of Pennsylvania, as is the case in this matter). Given that the Alleged Debtor has not yet been served there should be no question of the timeliness of this Motion.

If the debtor timely files an answer or a motion pursuant to Rule 1011, section 303(h) requires that a trial be held to determine whether an order for relief is warranted. Bankruptcy Rule 1013 provides that "the court shall determine the issues of a contested petition at the earliest practicable time and forthwith enter an order for relief, dismiss the petition, or enter any other appropriate order."

## ARGUMENT

Involuntary bankruptcy is a high-stakes venture because serious consequences can flow from an order of dismissal. If an involuntary case is dismissed without the petitioning creditors' consent, the bankruptcy court has discretion to award the alleged debtor attorney's fees and costs under section 303(i)(1). If the petition was filed in "bad faith," the bankruptcy court may also award damages under section 303(i)(2), which includes punitive damages.

## THE ELIGIBILITY REQUIREMENTS FOR FILING AN INVOLUNTARY BANKRUPTCY

Section 303 of the Bankruptcy Code contains three requirements for commencing an involuntary bankruptcy case: (1) there must be three or more petitioning creditors; (2) each petitioning creditor must hold a claim against the debtor that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount; and (3) the claims must aggregate at least $16,750 more than the value of liens on the debtor's property. 11 U.S.C. § 303(b)(1) (2006) (these numbers have been adjusted for inflation per 11 U.S.C. §104; If the debtor has fewer than twelve eligible creditors, then only one unsecured creditor with a qualifying claim is needed. *Id.*)

Excluded from the eligible class of petitioned creditors are employees, the debtor's insiders or any recipient of a voidable pre-bankruptcy transfer. Creditors with contingent claims or claims subject to a bona fide dispute are also ineligible. Requiring three eligible petitioning creditors in most cases protects the debtor from the involuntary bankruptcy risk at the instance of a single creditor.

**Each eligibility requirement is critical because if any is missing then "the petitioning creditors lack standing, the bankruptcy court lacks jurisdiction over the case, and thus the involuntary case must be dismissed."** (Emphasis added. *Rosenberg v. DVI Receivable XVII, LLC,* 835 F.3d 414, 416 (3d Cir. 2016), 414 B.R. at 840; *In re Charon,* 94 B.R. 403, 405–06 (Bankr. E.D. Va. 1988) (petitioner has

36

"burden of proving that it satisfied the jurisdictional requirements of [section] 303(b)"); 2 COLLIER ON BANKRUPTCY ¶¶ 303.11[3], 303.14[9] (*Resnick & Sommer eds.*, 16th ed.), which provides that "[t]he burden is on the petitioning creditor to establish a prima facie case that there is no bona fide dispute as to both liability and amount" and "the burden is on the petitioning creditor to prove they are qualified to file an involuntary petition". The court also found that the claims were both contingent and subject to a bona fide dispute. *Id.* at 844–846.

The Rosenberg involuntary bankruptcy was filed in the U.S. Bankruptcy Court for the Eastern District of Pennsylvania and transferred to the U.S. Bankruptcy Court for the Southern District of Florida, which dismissed the involuntary case with prejudice in August 2009. *Id.* at 848–49. The dismissal was affirmed by the district court and the Eleventh Circuit. *DVI Receivables XIV, LLC v. Rosenberg (In re Rosenberg)*, No. 10–24347 (S.D. Fla. Sept. 27, 2011), aff'd, 472 Fed. App'x 890 (11th Cir. 2012).

The Third Circuit has similarly found that even if all of section 303(b)'s statutory elements are met, a bankruptcy court can dismiss an involuntary case if it was filed in "bad faith" based on the "equitable nature of bankruptcy," reasoning that the "general 'good faith' filing requirement" that is generally recognized in the voluntary bankruptcy context also applies in the involuntary setting. *In re Forever Green Athletic Fields, Inc.*, 804 F.3d 328, 334 (3d Cir. 2015).

37

## PETITIONERS HAVE NOT SHOWN THAT THEY ARE QUALIFIED CREDITORS.

Petitioners have failed to meet the basic requirements for a valid involuntary bankruptcy. Therefore, the Petition should be dismissed.

"To qualify as a petitioning creditor, a creditor must set forth in his petition a provable claim, liquidated as to amount and not contingent as to liability. The existence and nature of these claims should be set forth with such particularity that the court can find from the petition the essential jurisdictional facts, and if this requirement is not met the petition should be dismissed." *In re State Realty Co. of Boston*, 131 F.Supp. 554, 555 (D. Mass. 1955).

Petitioners do not meet this standard. They submitted only a skeletal petition with no supporting documentation whatsoever and no information about the claims they rely upon other than their alleged amount. Moreover, the Declaration of Frydman and the numerous exhibits attached hereto evidence on their face that the two petitioners who are not employees of Deluxe do not have even a disputable claim against Deluxe. They have conspired with Mr. Hayes and Mr. Lewis to falsify invoices and swear our false and fraudulent certifications because they thumb their nose at this court and the bankruptcy process, and have taken this action believing that there can be no consequences for them. This in nothing more than a vindictive and bad faith filing initiated to cause harm to Deluxe and its management. Given the enormity of the action of forcing a company into bankruptcy, the petitioners should

38

meet their burden of proof or be dismissed.

## PETITIONERS HAVE NOT ESTABLISHED THAT THERE ISNO
## BONA FIDE DISPUTE AS TO THEIR CLAIMS.

Pursuant to Section 303(b)(1) of the Bankruptcy Code, "a petitioning creditor does not have standing if its debt is subject to a bona fide dispute." See *In re Vitaminspice*, 472 B.R. 282, 290 (Bankr. E.D. Pa. 2012). "Ultimately, whether a petitioning creditor's claim is the subject of a bona fide dispute is determined by whether 'there is a genuine issue of material fact that bears upon the debtor's liability, or a meritorious contention as to the application of law to undisputed facts.'" *Id.* (quoting *B.D.W. Assocs., Inc. v. Busy Beaver Bldg. Centers, Inc.*, 865 F.2d 65, 65 (3d Cir. 1989)). The petitioning creditors "bear the burden of providing prima facie evidence that their claims are not subject to a bona fide dispute." *Id.* Under this standard, the Court must determine whether there is an objective basis for either a factual or a legal dispute as to the validity of a debt. The Court's objective is to ascertain the existence of a dispute, not actually resolve the dispute. *In re AMC Investors, LLC*, 406 B.R. 478, 483-84 (Bankr. D. Del. 2009); *In re Rimell*, 946 F.2d 1363, 1365 (8th Cir.1991). The purpose of this requirement is to disqualify a creditor whenever there is "any legitimate basis" for the debtor not paying the debt, whether that basis is factual or legal. A debtor should not be forced to pay a legitimately disputed debt or be pressured to pay that debt by the commencement of an involuntary bankruptcy case. *In re TPG Troy, LLC*, 492 B.R. 150, 159 (Bankr.

39

*S.D.N.Y. 2015)*. Here, Petitioners have not even attempted to meet their burden of providing prima facie evidence that their claims are not subject to a bona fide dispute.

Congress intended to disqualify a creditor whenever there was any legitimate basis for the debtor not paying the debt, whether that basis is factual or legal. *In re BDC 56 LLC.*, 330 F.3d 111, 117-18 (2nd Cir. 2003). There is bona fide dispute presented to the court by virtue of this motion. The Court must ascertain whether a bona fide factual or legal dispute exists, and if it does, must dismiss this Petition.

### THE BANKRUPTCY COURT IS NOT A COLLECTION AGENCY

Allowing the Petition filed herein to proceed would lead to absurd results. It would be a signal to unscrupulous claimants everywhere that they could force the debtor into bankruptcy court as a way to extract that which they are not entitled, and put financial, reputational and emotional damage to those they wish to wrongfully hurt. Instead of making any attempt to allow the debtor to challenge the debt and instead of paying an attorney to collect a debt, they could simply pay a filing fee and go straight to bankruptcy court to collect a debt. "[T]he bankruptcy court is not a collection agency." *In re Mountain Dairies, Inc.*, 372 B.R. 623, 635 (Bankr. S.D.N.Y. 2007). See also *In re Century Tile and Marble, Inc.*, 152 B.R. 688, 689-90 (Bankr. S.D. Fla. 1993) (creditors' attorney sanctioned and involuntary petition dismissed pursuant to section 303 for "utilizing bankruptcy court as a collection agency instead of going to state court where collection claims are properly filed").

**THE PETITION WAS FILED FOR AN IMPROPER PURPOSE ANDIN BAD FAITH.**

The Petition filed herein was filed in bad faith. It was filed in retaliation for the Company's furloughing of employees and get the Petitioner's control of SYNC USA and payments they are not entitled to. The timing of the Petition is such that there can be no doubt that its sole purpose was to pressure the Company. "In considering dismissal under § 305, it is appropriate to consider the motivation of the parties in seeking jurisdiction of the bankruptcy court." *In re Spade*, 258 B.R. 221, 231 (Bankr. D. Colo. 2001).

Petitioners are so convinced they can force the Company to pay claims that are not legitimate and gain control of SYNC USA that even the prospect of creditor liability costs, attorney's fees, damages and possibly punitive damages did not slow them down or deter them. Despite their sophistication, in their haste to punish the Company and exact revenge, they filed a Petition with nothing on it other than the names and addresses of the Petitioners and a single amount for each which they claim is owed – nothing more! Petitioners knew that the filing of this Petition would have severe ramifications for the Company, which was trying to recover receivables through litigation to pay off debt.

When a creditor files an involuntary petition, the creditor must ensure not only that he is an eligible creditor, but that the process was done in good faith. While the

41

bankruptcy code does not define "bad faith," courts have found bad faith in cases where a creditor hopes to shut down the debtor's business, hopes to force the debtor into some type of negotiation, wants to take over control of the corporation itself, or the creditor wants to gain settlement leverage over the debtor. *E.g., In re Forever Green Athletic Fields, Inc.*, 500 B.R. 413, 426-30 (Bankr. E.D. Pa. 2013).

In *In re Forever Green Athletic Fields, Inc., Id,* the Third Circuit held that bad faith provides a basis for dismissing an involuntary bankruptcy petition regardless whether the statutory criteria for commencement of an involuntary case have been met and even when the debtor admits to not paying its debts as they come due. On the way there, the Third Circuit considered what it deemed to be an issue of first impression and ruled that bad faith serves as an independent basis for dismissal of an involuntary petition, even if the petitioning creditors meet the requirements of 11 U.S.C.A. § 303(b)(1). The Third Circuit then affirmed the bankruptcy court conclusion that the petitioners acted in bad faith. *In re Forever Green Athletic Fields, Inc.*, 804 F.3d at 335-37.

In granting Forever Green's motion to dismiss, the bankruptcy court explained that petitioning creditors must come to the court for a proper purpose. The bankruptcy court said that involuntary proceedings are intended to protect creditors from debtors who are making preferential payments to other creditors or from the dissipation of the debtor's assets. In contrast, if a creditor seeks to collect on a

personal debt to gain an advantage in pending litigation, or to harass the debtor, then the creditor is acting in bad faith. The bankruptcy court concluded that, even though the petitioning creditors met the statutory filing requirements, Mr. Dawson was a bad-faith creditor because he was motivated by two improper purposes: to frustrate Forever Green's efforts to litigate its claim against ProGreen and to collect on a debt.

Turning to the issue of bad faith, the Third Circuit noted that the one relevant reference to bad faith is found in 11 U.S.C.A. § 303(i)(2), which concerns post-dismissal damages. The petitioners argued that once the requirements of §§ 303(b) and 303(h) are satisfied, the subjective motives of the petitioners in filing an involuntary petition become irrelevant. Had Congress wanted to include bad faith as a separate basis for dismissal, Congress could have included it as an independent ground in §§ 303(b) or 303(h). Furthermore, unlike the bad faith dismissal of a voluntary petition, the court noted there is no for "cause" standard in § 303.

The Third Circuit launched its reasoning for imputing a good faith standard by addressing the text of § 303. The court analogizes the § 303(b)(1) criteria to "pleading a prima facie case" in that it is just the "first hurdle." The Third Circuit could see no reason why bad faith would be relevant for determining sanctions but not available as grounds for dismissal. The court notes "[t]he better view that, by including an express reference to bad faith in § 303, Congress intended for bad faith to serve as a basis for both dismissal and damages." *In re Forever Green Athletic*

*Fields, Inc.*, 804 F.3d at 334.

Turning from textual analysis, the Third Circuit wrote that the "bigger flaw" in the petitioners argument was that it overlooked the "equitable nature of bankruptcy." "As courts of equity, … bankruptcy courts are equipped with the doctrine of good faith so that they can patrol the border between good-and bad-faith filings." *In re Forever Green Athletic Fields, Inc.*, 804 F.3d at 334. Based upon policy considerations, the Third Circuit reasoned that allowing for dismissal based on bad faith "will encourage creditors to file petitions for proper reasons such as to protect against the preferential treatment of other creditors or the dissipation of the debtor's assets."

After determining that dismissal for bad faith was available, the Third Circuit reviewed the dismissal for abuse of discretion based upon the totality of the circumstances test and upheld dismissal. The Third Circuit considered Dawson's prepetition litigation strategy as indicative that Mr. Dawson would "use any means necessary to force payment of the Consent Judgment" and the abandonment of the putative debtor's claims against ProGreen. The Third Circuit noted that Dawson's actions "ran counter to the spirit of collective creditor action … . He [Dawson] put his own interest above all others." *Id.*

The Third Circuit was also troubled by the use of the bankruptcy process to pressure the putative debtor to pay the consent judgment "without regard to Forever

Green's other creditors, many of which had priority claims." The Third Circuit characterized the petitioners as trying to use the pending action as a debt-collection device. Lastly, the Third Circuit observed that the petitioners lacked any evidence that the putative debtor was engaged in preferential transfers or was depleting its assets.

**THE TOTALITY OF THE CIRCUMSTANCES WARRANTS A FINDING OF BAD FAITH AND DISMISSAL.**

In determining bad faith, the Court looks at the totality of the circumstances. As the Third Circuit has said:

> *In conducting this fact-intensive review, courts may consider a number of factors, including, but not limited to, whether: the creditors satisfied the statutory criteria for filing the petition; the involuntary petition was meritorious; the creditors made a reasonable inquiry into the relevant facts and pertinent law before filing; there was evidence of preferential payments to certain creditors or of dissipation of the debtor's assets; the filing was motivated by ill will or a desire to harass; the petitioning creditors used the filing to obtain a disproportionate advantage for themselves rather than to protect against other creditors doing the same; the filing was used as a tactical advantage in pending actions; the filing was used as a substitute for customary debt-collection procedures; and the filing had suspicious timing.*

> *Forever Green Athletic Fields, Inc.,* 804 F.3d at 336.

As demonstrated in the background section above and the attached exhibits as documentary evidence, understanding what Mr. Hayes did (in researching this exact issue for Mr. Frydman) and what Mr. Lewis did not do (undertake any scintilla of

45

reasonable investigation or due diligence) and the other matters addressed herein, the totality of the circumstances in this case warrants a finding of bad faith.

## THE PETITION SHOULD BE DISMISSED BECAUSE THERE IS NO BANKRUPTCY PURPOSE TO BE ACCOMPLISHED HERE.

Involuntary bankruptcy filings are extremely rare. This fact reflects the current understanding that the principal purpose of the Bankruptcy Code is to grant a fresh start to the honest, but unfortunate debtor. _Marrama v. Citizens Bank of Massachusetts_, 549 U.S. 365, 367 (2007). The primary focus of the current bankruptcy law is to give the debtor, rather than the creditors, relief.

There was no legitimate reason for initiating this case in the first place. The Company is not currently operating. Its primary assets are litigation claims which need to be pursued to judgement, and the best person to accomplish that at least cost and in the shortest time frame is the Company and its Manager. This Bankruptcy will only create a flood of lawyers all seeking a "piece of the action" and running up outrageous legal costs to (i) get up to speed on a case that is almost at the finish line; (ii) open the door for unnecessary and quite costly additional discovery; and (iii) otherwise deplete the fund available to use to pay creditors when the case is resolved.

The filing of an involuntary bankruptcy case only makes sense in certain limited situations not present in the case at bar. There can be no fear here that a debtor is rapidly depleting any resources available to pay creditors because other

46

than the lawsuits and some ownership interests in defunct entities, there are no assets to speak of. There can be no concern here about any hemorrhaging of money. There are no assets that require preservation or legal protection. The filing of an involuntary petition does absolutely nothing to preserve the assets of the Company.

Involuntary bankruptcy is most often used when unsecured creditors suspect fraud on the part of a company or for some other extraordinary reason. Otherwise, creditors will pursue collection of their own claims directly, through litigation in state or federal court. In this case the only fraudulent activity seems to be on the part of the petitioners and their counsel.

## ADVICE OF COUNSEL DEFENSE

A creditor considering the extraordinary step of filing an involuntary bankruptcy would be expected to consult with bankruptcy counsel, so the creditor's liability under section 303(i)(2) may turn on their ability to prove up an advice of counsel defense. That defense is not available if the debtor proves that the involuntary petition was filed for an "improper purpose," e.g., out of personal ill-will or to exert undue pressure over the debtor. Courts reason that such a creditor would have come to the attorney with their improper purpose already in mind, and thus cannot claim to have relied on their counsel's advice in pursuing the improper course of action. *Better Care*, 97 B.R. at 412 (Bankr. N.D. Ill. 1989); ("Where, however, the purpose is improper, the client will usually come into the attorney's office with

47

that purpose already formed. It is the purpose which constitutes bad faith in such a case and it is the client who is responsible for the purpose." In addition, the creditor must prove that it made a reasonable inquiry into the debtor's financial circumstances and fully disclosed that information to its attorney in order to claim good faith reliance on the attorney's advice; courts have rejected the advice of counsel defense when material information was withheld from counsel. *In re Landmark Distribs., Inc.,* 189 B.R. 290, 317–18 (Bankr. D. N.J. 1995).

There can be no doubt that not only the petitioning creditors, but also the lawyer in this case made no inquiry of the facts, undertook no investigation, sought no evidence to support the claims asserted. Indeed, when five days after the filing of the Involuntary petition, Frydman made Mr. Lewis aware that the claims cannot survive the requirements of the Bankruptcy code, rather than take corrective action – or at least undertake an investigation of the facts – he doubled down on his fraud, and lied to this court about service of process as well as with respect to his need for an expedited entry of an order for relief, all as fast as possible, in the hope that he could forestall what he likely assumed would be a significant challenge to this petition. Such conduct should not be permitted.

In fact, Mr. Lewis might want to reconsider in light of Rule 11 of the Federal Rules of Civil Procedure, which is designed to ensure that claims brought in the federal courts have merit and are not brought for an improper purpose. *Golden Eagle*

*Distrib. Corp. v. Burroughs Corp.*, 801 F.2d 1531, 1537 (9th Cir. 1986); *Eastway Constr. Corp. v. City of New York*, 762 F.2d 243, 254 (2d Cir. 1985), modified on other grounds, 821 F.2d 121, cert denied, 108 S. CL 269 (1987).

To accomplish these goals, Rule 11 imposes upon an attorney or litigants a duty to make a reasonable examination of the merits of and motives behind a claim before signing a paper and filing it with the court. ***Rule 11 imposes mandatory sanctions for failure to comply with this duty, and the Rule encourages both courts and litigants to play an active role in deterring litigation abuses***. (Emphasis Added) ***"the court, upon motion or upon its own initiative, shall impose... an appropriate sanction"*** (emphasis added). See, eg., *Brown v. Federation of State Medical Bds.*, 830 F.2d 1429, 1433 (7th Cir. 1987); *Golden Eagle Distrib. Corp. v. Burroughs Corp.*, 801 F.2d 1531, 1540 (9th Cir. 1986); *Eastway Constr. Corp. v. City of New York.* 762 F.2d 243, 254 n.7 (2d Cir. 1985), modified on other grounds, 821 F.2d 121, cert. denied, 108 S. Ct. 269 (1987).

Fed. R. Civ. P. I1. The text of Rule 11 provides in relevant part:

> *Every pleading, motion, and other paper of a party represented by an attorney shall be signed by at least one attorney.... A party who is not represented by an attorney shall sign the party's pleading, motion, or other paper.... The signature of an attorney or party constitutes a certificate by the signer that the signer has read the pleading, motion or other paper, that to the best of the signer's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay*

49

*or needless increase in the cost of litigation. If a pleading, motion, or other paper is not signed, it shall be stricken unless it is signed promptly after the omission is called to the attention of the pleader or movant. If a pleading, motion, or other paper is signed in violation of this rule, the court, upon motion or upon its own initiative, shall impose upon the person who signed it, a represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the pleading, motion, or other paper, including a reasonable attorney's fee. Fed. R- Civ. P. 11.*

Rule 11 sanctions can be imposed upon the signing attorney, the party he or she represents, or both, or on an unrepresented party who signs a pleading. Fed. R. Civ. P. 11; Fed. R. Civ. P. I I advisory committee's note, reprinted in 97 F.R.D. 165, 200 (1983).

Deluxe asserts that the actions of Mr. Lewis, and the actions of Mr. Hayes should subject both to Rule 11 sanctions, and Deluxe requests that this court consider same.

## THE COMPANY SHOULD BE AWADED ITS FEES, COST ANDDAMAGES UNDER SECTION 303(i).

There is a presumption that costs and attorney's fees will be awarded to a putative debtor where an involuntary petition is dismissed. *In re Express Car Truk & Rental, Inc.*, 440 B.R. 422, 431-32 (Bankr. E.D. Pa. 2010). A petitioner bears the burden of proof on justifying a denial of costs and fees. Section 303(i) provides:

*If the court dismisses a petition under this section other than on consent of all petitioners and the debtor, and if the debtor does not waive the right to judgment under this subsection, the court may grant judgment (1) against the*

50

*petitioners and in favor of the debtor for (A) costs; or (B) a reasonable attorney's fee; or (2) against any petitioner that filed the petition in bad faith, for (A) damages proximately caused by such filing; or (B) punitive damages.*

11 U.S.C. §303(i).

In *Rosenberg*, the district court conducted a two-phase unprecedented jury trial: first a liability phase to determine whether the bank had filed the involuntary petition in bad faith; and second, a damages phase in which the jury could consider various categories of compensatory damages as well as punitive damages. *Rosenberg v. DVI Receivables, XIV, LLC,* Case No. 12-22275-CIV, 2014 WL 4810348, at *1 (S.D. Fla. Sept. 29, 2014), aff'd in part, vacated in part, rev'd in part, 818 F.3d 1283 (11th Cir.2016). After an eleven-day trial, the jury found that the bank had acted in bad faith and awarded Rosenberg $1.12 million in compensatory damages for lost wages, loss of reputation and "garden variety" emotional distress, together with $5 million in punitive damages.

In a case seeking damages under section 303(i)(2), the fact-finder presumes that the petitioning creditor acted in good faith and the debtor has the burden of proving "bad faith," which is the prerequisite to awarding damages under the statute. *In re John Richards Homes Bldg. Co., LLC,* 439 F.3d 248, 254 (6th Cir. 2006). This requires the bankruptcy court — or the jury, as was the case in Rosenberg — to analyze the "totality of the circumstances" surrounding the filing of the involuntary petition, for example, whether the

51

petitioning creditors filed the involuntary petition in order to exert pressure or otherwise gain an improper advantage in a dispute with the debtor, and whether the decision to file the involuntary petition was motivated by personal ill-will or malice. *Id.* at 255 (collecting cases and affirming finding of bad faith where, among other things, the petitioning creditor was motivated to coerce the debtor into a settlement or destroy its business).

Section 303(i)(2) expressly authorizes a stand alone award of punitive damages even in the absence of actual damages because it authorizes the court to award "**any damages proximately caused**" by a bad faith filing or punitive damages. *Sunbelt Devs.*, 608 F.3d at 465; 11 U.S.C. § 303(i)(2) (emphasis added). In other words, "the sole precondition" to awarding punitive damages "is a showing of bad faith." *Id.*

## THE COMPANY RESPECTFULLY REQUESTS AN EVIDENTIARY HEARING.

The Court should hold an evidentiary hearing, after allowing for discovery, to permit the Company to make a full record on these issues to further support its claims, and to allow the Court to make findings so as to determine whether dismissal and/or abstention and/or an award of costs, fees and damages are warranted.

## CONCLUSION

WHEREFORE, the Company respectfully requests that the Court grant this

Motion to Dismiss the Involuntary Petition and enter judgment against Petitioners and in favor of the Company for costs, reasonable attorney's fees and punitive damages, sanction Mr. Lewis and Mr. Hayes under Rule 11 of the Federal Rules of Civil Procedure, make criminal referrals to the appropriate federal prosecutors with respect to the possible criminal conduct of the Petitioners, Mr. Lewis and Mr. Hayes, and grant such other and further relief as the Court deems proper.

Dated: June 7, 2021

Respectfully submitted,

/s/ Jacob Frydman
on behalf of Alleged Debtor
Deluxe Building Solutions, LLC, Pro Se
c/o Jacob Frydman
46 Ledgerock Lane
Hyde Park, NY 12538
917-578-3800
jf@frydco.com

53

UNITED STATES BANKRUPTCY COURTMIDDLE

DISTRICT OF PENNSYLVANIA

In Re:                                        )
                                              )
DELUXE BUILDING SOLUTIONS, LLC                )    Case No. 5:21-bk-00534-HWV
                                              )
    ALLEGED DEBTOR.                           )    Chapter 7 - INVOLUNTARY
                                              )
                                              )

Type text here

## **DECLARATION OF JACOB FRYDMAN**

I, Jacob Frydman, Manager of Deluxe Building Solutions, LLC declares under penalty of

perjury that the facts alleged in the foregoing Motion of alleged Debtor Deluxe Building Solutions,

LLCin the foregoing motion to Dismiss the Involuntary Bankruptcy Petition is true and correct.

Executed on June 7, 2021.

Jacob Frydman

# CERTIFICATE OF SERVICE

I, Jacob Frydman, as Manager of alleged Debtor Deluxe Building Solutions, LLC, acting Pro Se, hereby certify that a true and correct copy of the foregoing Motion of alleged Debtor Deluxe Building Solutions, LLC, acting Pro Se, to Dismiss the Involuntary Bankruptcy Petition, was been served by first class mail, postage prepaid, on the persons listed below this 7th day of June 2021.

Petitioning Creditor
Taylor & Peterson
12 Rogers Road
Haverhill, MA 01835

Petitioning Creditor
Superior Controls, Inc.
135 Folly Mill Road
Seabrook, NH 03874

Petitioning Creditor
James Wieler
136 Lafayett Road
North Hampton, NH 03862

Petitioning Creditor
Robert Labanara
130 Millbrook Road
Northhaven, CT 06473
518-852-0642

General Counsel to the Alleged Debtor
Andrew Hayes, Esq.
45 Stanwich Road
Greenwich, CT 06831

Counsel for Petitioning Creditors
Harry D Lewis
2 Park Avenue
Ste. 2000

New York, NY 10016


Asst. U.S. Trustee
United States Trustee
228 Walnut Street, Suite 1190
Harrisburg, PA 17101
717 221-4515

Gregory Benjamin Schiller
US Department of Justice
Office of the US Trustee
228 Walnut Street, Room 1190
Harrisburg, PA 17101

Robert P. Sheils, Jr (Trustee)
Sheils Law Associates, PC
108 North Abington Road
Clarks Summit, PA 18411

Jill M. Spott
Sheils Law Associates, PC
108 North Abington Road
Clarks Summit, PA 18411

Gary D. Bressler, Esquire
1617 John F. Kennedy Blvd., Suite 1500
Philadelphia, PA 19103


/s/ Jacob Frydman
on behalf of Alleged Debtor
Deluxe Building Solutions, LLC,
Pro Se
c/o Jacob Frydman
46 Ledgerock Lane
Hyde Park, NY 12538
917-578-3800
jf@frydco.com