## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

IN RE:                      :

                           :    CHAPTER 7

DELUXE BUILDING SOLUTIONS, LLC,    :

                           :    CASE NO. 5:21-bk-00534-HWV

           Alleged Debtor.         :

## MEMORANDUM OPINION

This matter comes before the Court on a Motion to Dismiss the Involuntary Chapter 7 Petition filed by the Alleged Debtor, Deluxe Building Solutions, LLC (the "Alleged Debtor"). (Doc. 120.) For the following reasons, the Court will deny the requested relief in part, but will leave the record open for consideration of the remaining creditors' claims.[1]

### I. JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) (matters concerning the administration of the estate).

### II. FACTUAL BACKGROUND AND PROCEDURAL POSTURE

The Alleged Debtor is a United States-based manufacturer of large-scale commercial volumetric steel modular buildings formerly operating out of Berwick, Pennsylvania. (Doc. 121-2, p. 15.)[2] The Alleged Debtor is affiliated with a larger group of companies that focus on various aspects of architecture, engineering and construction software, technologies, and other innovations collectively known as the "Deluxe Group." (Id.) Frydco Capital Group, LLC ("Frydco") and Winter Investors, LLC ("Winter") owned all interests in the Alleged Debtor

---

[1] The remaining Joining Creditors are Central Builders Supply Company; Michelle Matthews Andreotti; Underscore Marketing, LLC; Ava Rae Flamish; Scott Robbins; and Joseph Styczynski (collectively, the "Joining Creditors"). (Docs. 147, 148, 149, 151, 152, 161.)

[2] For ease of reference, and where appropriate, the Court utilizes the page numbers from the CM/ECF footer.

through December 31, 2020, after which iBUILT Group, LLC ("iBUILT") became the owner of same. (Doc. 165, pp. 169, 210; Doc 216, p. 147.) Jacob Frydman ("Frydman") controls the Alleged Debtor as its designated Manager. (Doc. 121-2, p. 15.)

SyncPark, LLC ("SyncPark") is a Delaware limited liability company with an address at 4 South Stanwich Road, Greenwich, Connecticut. (*Id.* at 3, 54.) SyncPark was formed to develop a system that automatically moves vehicles through an automated self-parking facility using linear synchronous motor technology (the "SyncPark System"). (*Id.* at 15.) Andrew W. Hayes ("Hayes") and James G. Wieler ("Wieler") own and control SyncPark. (Doc. 144, p. 41; Doc. 242, p. 22.)

In early 2020, the Alleged Debtor and SyncPark entered into a joint venture for the purpose of designing, manufacturing, and building automated self-parking garages modeled after the SyncPark System throughout the United States. (Doc. 121-2, p. 16.) To that end, on April 29, 2020, the Alleged Debtor and SyncPark entered into an operating agreement (the "JV Operating Agreement") to form this joint venture, which they named SyncPark USA, LLC (the "Joint Venture"). (*See* Doc. 121-2.) Pursuant to the terms of the JV Operating Agreement, Frydman and Hayes were designated as non-member managers of the Joint Venture, and Wieler and Hayes were designated as its executives.[3] (*Id.* at 3.) As its managers, Frydman and Hayes made up the Board of the Joint Venture. (*Id.* at 33.)

By agreement, the Alleged Debtor and SyncPark were each required to make an initial capital contribution in exchange for their ownership interest in the Joint Venture. (*Id.* at 16.)

---

[3] Frydman's involvement with Wieler and Hayes was not limited to the Joint Venture. Around the same time period that the Joint Venture was formed, Wieler and Hayes were offered employment with the Deluxe Group; Hayes as its General Counsel, and Wieler as its Chief Systems Officer. (Doc. 144, p. 42; Doc. 217, pp. 67, 100.) Wieler and Hayes' employment agreements with the Deluxe Group stated that they were to be employed "through one or more Members of the [Deluxe Group], as Deluxe shall from time-to-time determine." (Doc. 245, ¶ 127.) Wieler and Hayes held these positions until January 4, 2021, and March 12, 2021, respectively. (Doc. 144, p. 58; Doc. 237, p. 48.)

SyncPark's initial capital contribution to the Joint Venture included all its rights, title, license, and interest in and to the SyncPark System, as well as all the other assets it owned, in exchange for a 50% membership interest in the Joint Venture. (*Id.* at 16, 20.) The Alleged Debtor's initial capital contribution included an in-kind contribution of: (1) space in one of its buildings in Berwick, Pennsylvania for use by the Joint Venture; (2) certain design services, components, and construction work, each as defined in the JV Operating Agreement; and (3) a commitment to fund necessary purchases that it or other entities in the Deluxe Group could not manufacture and to pay for necessary engineering work that it or other entities in the Deluxe Group could not provide, subject to the terms and conditions set forth in the JV Operating Agreement (the "Funding Commitment"); all in exchange for a 50% membership interest in the Joint Venture. (*Id.*) This Funding Commitment was capped by the JV Operating Agreement at approximately $500,000, with the precise amount to be set forth in a budget prepared by Wieler and Hayes and submitted to the Board for approval by May 15, 2020 (the "Proposed Budget"). (*Id.* at 20, 33.) Upon approval by the Board, the Proposed Budget would become the Approved Budget. (*Id.* at 33–34.)

While it is clear that the Alleged Debtor's Funding Commitment was implicated once the Proposed Budget was approved, it is unclear whether such an obligation arises under a Proposed Budget that has not been approved. It is also unclear from the record if a Proposed Budget was ever submitted to the Board for approval in accordance with the terms of the JV Operating Agreement and, if it was, whether it was ever formally approved by the Board.[4]

---

[4] Conflicting testimony was offered on this subject by Frydman and Wieler. (*Compare* Doc. 216, pp. 131–32 (noting that Wieler and Hayes never submitted a proposed 2020 budget) *with* Doc. 144, p. 127 (testifying that the 2020 budget "was approved and executed upon"); Doc. 164, p. 68 (noting that a budget was approved on May 20, 2020), p. 158 (testifying that the 2020 budget was approved in August 2020).)

To advance the Joint Venture's purpose, the Joint Venture's members and executives decided to build a test garage using the SyncPark System as a proof of concept for investors (the "POC Garage"). (*Id.* at 15.) To assist with marketing the POC Garage to investors, Robert Labanara ("Labanara") was hired by the Joint Venture as a Business Development Consultant. (Doc. 165, p. 100.) Construction of the POC Garage was facilitated by Wieler and Hayes, who in their capacity as executives for the Joint Venture, and in apparent reliance upon the Funding Commitment, sought to retain third-party contractors outside of the Deluxe Group to contribute work and services for the POC Garage as if a Proposed Budget had been timely submitted and approved by the Board. (Doc. 144, pp. 43–44, 46, 49; Doc. 237, p. 200.) Two such contractors were Superior Controls, Inc. ("Superior") and Taylor & Peterson ("T&P"), which were retained to perform engineering and design work on the POC Garage. (Doc. 144, pp. 44, 46; Doc. 164, pp. 88, 174–75; Doc. 237, p. 200.)

Despite apparent efforts to build the POC Garage, Frydman admits that the Alleged Debtor struggled financially throughout its relationship with the Joint Venture. (Doc. 165, pp. 216–17.) According to Frydman, the original members of the Alleged Debtor, Winter and Frydco, invested some $31 million to support the Alleged Debtor from January 2018 through December 31, 2020. (*Id.* at 216.) While there was evidence that the Joint Venture had the potential to become profitable, in Winter and Frydco's view, the Alleged Debtor's significant financial deficit eventually outweighed the promise held by the Joint Venture. (*Id.* at 216–17.) Thus, effective December 31, 2020, Frydman asserts that Winter and Frydco transferred all their ownership interests in the Alleged Debtor to a newly formed member of the Deluxe Group called iBUILT. (Doc. 165, p. 210; Doc. 216, p. 147.) Contemporaneously, Frydman asserts that the Alleged Debtor also transferred its employees to iBUILT to continue the Alleged Debtor's

4

limited operations, causing the Alleged Debtor to effectively cease all operations as of December 31, 2020.[5]  (Doc. 165, pp. 210, 217; Doc. 216, pp. 115–16, 121–22; Doc. 245, ¶¶ 123–24.) Shortly thereafter, Frydman asserts iBUILT began to furlough or lay off most of the employees transferred to it from the Alleged Debtor, including Wieler and Labanara.[6]  (Doc. 144, p. 58; Doc. 165, p. 106; Doc. 216, pp. 115–16; Doc. 217, p. 108.)

As a result of these events, the Alleged Debtor ceased payment on a number of its financial obligations while waiting for its only source of income from receivables and anticipated litigation payouts to arrive.  (Doc. 216, pp. 100–01.)  Accordingly, on March 18, 2021, T&P, Superior, Labanara, and Wieler (collectively, the "Petitioning Creditors"), filed an involuntary bankruptcy petition pursuant to 11 U.S.C. § 303 against the Alleged Debtor seeking to recover debts allegedly owed to them by the Alleged Debtor.  (Doc. 1.)  T&P and Superior filed claims as alleged trade creditors of the Alleged Debtor, while Wieler and Labanara assert that they are owed unpaid wages and reimbursement for various expenses from the Alleged Debtor.  (*See* Proof of Claim 3-1; 20-1; 21-1; 31-1; 32-1; 34-1.)

The Alleged Debtor filed the instant Motion to Dismiss on September 2, 2021.  (Doc. 120.)  The Petitioning Creditors filed their Objection to the Motion on September 22, 2021. (Doc. 133.)  The Court held seven non-consecutive days of evidentiary hearings on the Motion to Dismiss and Objection between September 23, 2021 and February 24, 2022,[7] during which the Court heard testimony from the following witnesses: (1) Wieler; (2) Alastair Taylor ("Taylor"),

---

[5] After December 31, 2020, the Alleged Debtor continued operating solely for the purposes of collecting outstanding receivables, including potential recoveries from pending litigation, and paying as many of its liabilities as it could. (Doc. 165, p. 216.)

[6] Specifically, Wieler was furloughed on January 4, 2021, and Labanara was furloughed on February 8, 2021.  (Doc. 144, p. 58; Doc. 165, p. 106.)

[7] The Court conducted hearings on September 23, December 15, and December 16, 2021, and on January 19, January 20, February 2, and February 24, 2022.  (Docs. 144, 164, 165, 216, 217, 237, 242.)

one of the owners of T&P; (3) Labanara; (4) Frydman; (5) Rick Pierro ("Pierro"), the President of Superior; and (6) Hayes.[8] (*See* Docs. 144, 164, 165, 216, 217, 237, 242.) Upon the request of the parties, the Court permitted extensive post-trial briefing, which concluded on May 4, 2022. (Docs. 245, 246, 247, 251, 252, 253.) The Motion is therefore ripe for the Court's review.

## III. ANALYSIS

There are primarily two issues before the Court, each having two parts. The first issue is whether the Petitioning Creditors have standing to file the involuntary petition against the Alleged Debtor pursuant to 11 U.S.C. § 303(b) and, if so, whether the Alleged Debtor is generally not paying its debts as they become due pursuant to 11 U.S.C. § 303(h). The second issue is whether the involuntary petition was filed in bad faith and, if so, whether additional creditors should be barred from utilizing 11 U.S.C. § 303(c) to join the petition under the bad faith bar to joinder rule. The Court discusses these issues in the order presented.

### A. Section 303(b) Analysis

Where an alleged debtor has twelve or more creditors, as is the case here, § 303(b)(1) contains three requirements for commencing an involuntary action against the alleged debtor: (1) there must be three or more petitioning creditors; (2) each petitioning creditor must hold a claim against the alleged debtor that is not contingent as to liability or the subject of a bona fide dispute; and (3) the claims must aggregate at least $16,750 more than the value of the liens on the alleged debtor's property. 11 U.S.C. § 303(b)(1); *In re Forever Green Athletic Fields, Inc.*, 804 F.3d 328, 333 (3d Cir. 2015); *In re Raymark Industries, Inc.*, 99 B.R. 298, 299 (E.D. Pa.

---

[8] On September 23, 2021, the morning of the first day of trial, Hayes joined the Petitioning Creditors by asserting his own claim against the Alleged Debtor. Five other creditors later asserted claims against the Alleged Debtor as well. Hayes, though not a Petitioning Creditor, was called by the Petitioning Creditors in defense of their assertion that bad faith is not present in this case, but in the process, Hayes testified in defense of his own claim. Therefore, the Court considers his claim herein. However, the Court does not address the claims of the remaining Joining Creditors in the instant opinion. Instead, the Court will issue a separate opinion following a future trial on the remaining Joining Creditors' claims.

1989) (citing 11 U.S.C. § 303(b)(1)). The initial burden is on the petitioning creditors to establish each element of § 303(b)(1), including a *prima facie* case that their claims are not contingent as to liability or subject to a bona fide dispute. *In re Graber*, 319 B.R. 374, 377 (E.D. Pa. 2004). If satisfied, the burden then shifts to the alleged debtor to rebut same and, when necessary, to establish the existence of a contingency or a bona fide dispute. *In re VitaminSpice*, 472 B.R. 282, 290 (E.D. Pa. 2012).

A claim is the subject of a bona fide dispute if "there is a genuine issue of a material fact that bears upon the debtor's liability, or a meritorious contention as to the application of law to undisputed facts." *B.D.W. Assocs., Inc. v. Busy Beaver Bldg. Ctrs., Inc.*, 865 F.2d 65, 66 (3d Cir. 1989) (quotation marks omitted). Therefore, the evaluating court must determine whether there is an objective basis for either a factual or a legal dispute as to the validity of the debt. *Id.* The court is not required to resolve the dispute—only to identify its presence or absence. *Id.* If the court determines that a bona fide dispute exists, it must disqualify the claim and dismiss the petition if appropriate. *Id.* A claim is contingent as to liability if:

> the debt is one which the debtor will be called upon to pay only upon the occurrence or happening of an extrinsic event which will trigger the liability of the debtor to the alleged creditor and if such triggering event or occurrence was one reasonably contemplated by the debtor and creditor at the time the event giving rise to the claim occurred.

*In re Raymark Industries, Inc.*, 99 B.R. at 301 (quoting *In re All Media Properties, Inc.*, 5 B.R. 126, 133 (S.D. Tex. 1980), *aff'd*, 646 F.2d 193 (5th Cir. 1981)).

Initially, the Court observes that the Alleged Debtor does not dispute that this case was commenced by three or more entities, each of which argue they are the holder of a claim against the Alleged Debtor, and that such claims, if allowed, are asserted to aggregate at least $16,750 more than the value of any lien on property of the Alleged Debtor securing such claims. (Doc.

7

144, pp. 29–31.) However, the Alleged Debtor does dispute the Petitioning Creditors' assertion that their claims are not subject to a bona fide dispute or contingent as to liability. (Doc. 251, p. 6.) Moreover, the Alleged Debtor asserts that it is still paying its debts as they come due as required by § 303(h). The Alleged Debtor thus argues the Petitioning Creditors lack standing to bring the instant involuntary petition.

The Court considers these arguments below with respect to the Petitioning Creditors' claims.

### 1. The Claims of T&P and Superior.

T&P and Superior base their claims on the Alleged Debtor's failure to pay them for work completed pursuant to trade contracts purportedly entered with the Alleged Debtor. (Proof of Claim 21-1, Attachment 4; Proof of Claim 34-1, Attachment 1.) These contracts are evidenced by purchase orders for the performance of services related to the Alleged Debtor's business venture.[9] (*See id.*) Thus, T&P and Superior's claims are grounded on an alleged breach of contract by the Alleged Debtor.

To establish a cause of action for breach of contract under Pennsylvania law, T&P and Superior must prove the following: (1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract, and (3) resultant damages. *Ware v. Rodale Press,*

---

[9] The Court notes that T&P and Superior appear to believe that either the Uniform Commercial Code or an equitable theory of recovery under Pennsylvania contract law is implicated by their contracts with the Alleged Debtor. However, it is clear that Pennsylvania contract law governs agreements to provide services, like those in this case, whereas Article 2 of the Uniform Commercial Code governs transactions for **goods**. *See Lakeview Pharm. of Racine, Inc. v. Catamaran Corp.*, No. 3:15-cv-290, 2016 U.S. Dist. LEXIS 76320, at *9–10 (M.D. Pa. June 13, 2016) (noting that "in order to trigger the provisions of the UCC, the plaintiff must allege facts sufficient to demonstrate that the parties' contract involved a 'transaction in goods'"); 13 PA. CONS. STAT. § 2105 (defining "goods," in pertinent part, as all things "which are movable at the time of identification to the contract for sale"). The purchase orders at issue in this case evidence a transaction involving services, rather than goods. Indeed, the purchase orders and invoices refer to "design work," "[c]onsulting, meetings, etc.," "programming," and "engineering/design work" to be provided by T&P and Superior. (*See* Proof of Claim 21-1 Attachment 4; Proof of Claim 34-1 Attachment 1.) Such descriptors are not "movable at the time of identification to the contract for sale" as required to trigger the UCC. Accordingly, the Court applies Pennsylvania contract law in considering these claims, rather than the UCC.

8

*Inc.*, 322 F.3d 218, 225 (3d Cir. 2003); *Patel v. Dhaduk*, 427 F. Supp. 3d 571, 577 (M.D. Pa. 2019), *aff'd*, 839 F. App'x 715 (3d Cir. 2020). At a minimum, a contract requires an offer, acceptance of that offer, and consideration. *A.S. v. Off. for Disp. Resol. (Quakertown Cmty. Sch. Dist.)*, 88 A.3d 256, 265–66 (Pa. Commw. Ct. 2014) (citing *Reed v. Pittsburgh Board of Public Education*, 862 A.2d 131, 134 (Pa. Commw. Ct. 2004)).

Accordingly, to conclude that T&P and Superior's claims are not subject to a bona fide dispute, the Court must first determine that a contract was formed, including its essential terms. Based on the evidence and argument presented, the Court finds that it is clear that the purchase orders constitute offers to T&P and Superior. However, it is not clear that these offers were validly extended by or on behalf of the Alleged Debtor. The Court finds that this discrepancy could well constitute a bona fide dispute sufficient to undermine T&P and Superior's standing for § 303(b)(1) purposes. Nevertheless, the Court need not reach this conclusion because even if the offers were extended by the Alleged Debtor, the Court finds that there is a bona fide dispute regarding whether T&P and Superior properly accepted these offers.

Acceptance of an offer requires "a manifestation of assent to the terms thereof made by the offeree in a manner invited or required by the offer." *Schott v. Westinghouse Elec. Corp.*, 259 A.2d 443, 447 (Pa. 1969) (citation omitted). Indeed, "[i]t is settled law that the offeror is the master of his offer, and his provision as to time, place and manner or mode of acceptance must be complied with." *Van Schoiack v. U.S. Liab. Ins. Co.*, 133 A.2d 509, 514–15 (Pa. 1957); *Harrison v. Nissan Motor Corp. in U.S.*, 111 F.3d 343, 348 (3d Cir. 1997). Accordingly, the failure to accept an offer in the manner invited or required by the offer can be fatal to the formation of a contract under Pennsylvania law. *See Van Schoiack*, 133 A.2d at 514–15

(declining to enforce a contract when the offeree could not produce evidence of his compliance with the terms of the offer and the offeror denied the formation of the contract).

In this case, the purchase orders relied upon by T&P and Superior include the terms of acceptance, which read as follows:

> **Acceptance**. Each [Purchase Order] is not binding on [the Alleged Debtor] until [T&P/Superior] accepts the Order in writing. If [T&P/Superior] does not accept the Order in writing within thirty (30) days of [T&P's/Superior's] receipt of the Order, the Order will lapse unless otherwise agreed to by [the Alleged Debtor] in writing. [The Alleged Debtor] may withdraw the Order at any time before it is accepted in writing by [T&P/Superior].

(Proof of Claim 21-1, Attachment 4; Proof of Claim 34-1, Attachment 1.) While T&P and Superior each claim that they accepted the purchase orders and began performance of the services bargained for therein, neither T&P nor Superior were able to produce a writing evidencing timely acceptance of the purchase order in accordance with the offer's written requirements.

Indeed, T&P's president testified: "I countersigned it by email. Unfortunately, I don't have a copy of that email. Presumably it would be the Deluxe Building Systems – Solutions emails somewhere." (Doc. 164, p. 213.) T&P's president further testified that it was not his practice to retain such emails. (Doc. 165, p. 19 ("Typically with these sorts of [purchase orders] where they want a countersignature, I reply in writing via email, and I don't have a copy of that email.").) Superior's president similarly testified that while the purchase order "could have been countersigned," he did not know for sure. (Doc. 216, p. 73 ("Sometimes we get orders, we start working right away, and it's not particularly important that I countersign it. I may have, I don't know.").) In addition, the Alleged Debtor's chief systems officer, with whom both T&P and Superior had most of their dealings, testified that he could not say definitively whether he was aware of a countersigned version for either purchase order. (*See* Doc. 144, p. 107.) While the

10

testimony presented by T&P and Superior was equivocal regarding whether the terms of acceptance in the purchase orders had been complied with, Frydman's testimony flatly stated that "neither of these purchase orders [were] accepted."[10] (Doc. 216, pp. 133–34.)

Based on this testimony and lack of physical evidence, the Court finds that there is a bona fide dispute as to whether T&P or Superior accepted the offers in compliance with the terms of acceptance set by the Alleged Debtor. Having identified this dispute, the Court finds that T&P and Superior have failed to establish their *prima facie* case that their claims are not contingent as to liability or subject to a bona fide dispute under § 303(b)(1). The claims of T&P and Superior will therefore be disqualified for purposes of § 303(b)(1).

### 2. The Claim of Wieler.

Generously construed, Wieler bases his claim on the Alleged Debtor's failure to reimburse him for business and health care expenses. (Doc. 144, pp. 53–58.) Specifically, Wieler asserts that he incurred between $527.71 and $750 for travel expenses, which he believes he is entitled to recover from the Alleged Debtor. (*Id.* at 56–58.) Wieler also alleges that he is entitled to $1,026.80 in health care expense reimbursement from the Alleged Debtor under the Consolidated Omnibus Budget Reconciliation Act ("COBRA") because the Alleged Debtor failed to inform him that his health insurance was about to be cancelled, but that he had a right to continue his health insurance at his own cost.[11] (*Id.* at 54–56.)

---

[10] Notably, Frydman also testified that "the first time [he] ever saw [the] purchase order[s] was in this trial[.]" (Doc. 216, p. 141.)

[11] The Court notes that Wieler's claims have evolved over the course of this litigation. At the time the petition was filed, Wieler had a single non-specified claim for $527.71. (*See* Doc. 1, p. 4.) In his proof of claim, Wieler's claim was listed as $1,026.80 for allegedly unreimbursed medical expenses only; this document did not mention Wieler's claim for allegedly unreimbursed travel expenses. (*See* Proof of Claim 3-1.) It was only during his testimony at trial that Wieler indicated that his claims consisted of $750 or $527.71 in allegedly unreimbursed travel expenses as well as $1,026.80 for allegedly unreimbursed health care expenses. (Doc. 144, pp. 53–58, 173–74.)

11

While Wieler's claim for unreimbursed business expenses was presented based on a breach of contract theory of recovery, the Court notes that the Pennsylvania Wage Payment and Collection Law ("WPCL") serves as the statutory framework for employees "to recover wages and other benefits that are contractually due to them."[12] *Oberneder v. Link Computer Corp.*, 696 A.2d 148, 150 (Pa. 1997); 43 PA. CONS. STAT. § 260.9a. Courts interpreting Pennsylvania law within this Circuit have found that "'a prerequisite for relief under the WPCL is a contract between employee and employer that sets forth their agreement on wages to be paid. . . . . Relief under the WPCL is implausible without [the] existence of a contract.'" *Scott v. Bimbo Bakeries, USA, Inc.*, No. 10-3154, 2012 WL 645905, at *4 (E.D. Pa. Feb. 29, 2012) (quoting *Lehman v. Legg Mason, Inc.*, 532 F. Supp. 2d 726, 733 (M.D. Pa. 2007)). "The 'WPCL does not create a right to compensation. Rather, it provides a statutory remedy when the employer breaches a contractual obligation to pay earned wages. The contract between the parties governs in determining whether specific wages are earned.'" *Scott*, 2012 WL 645905, at *4 (quotations omitted).

As explained above, to establish a cause of action for breach of contract under Pennsylvania law, Wieler must prove the following: (1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract, and (3) resultant damages. *Ware*, 322 F.3d at 225; *Patel*, 427 F. Supp. 3d at 577. Accordingly, to conclude that Wieler's claims are not subject to a bona fide dispute, the Court must first determine that a contract exists,

---

[12] The WPCL provides that "[e]very employer shall pay all wages, other than fringe benefits and wage supplements, due to his [employees] on regular paydays designated in advance by the employer." 43 PA. CONS. STAT. § 260.3(a). For purposes of this law, employers include "every person, firm, partnership, association, cooperation, receiver or other officer of this Commonwealth and any agent or officer of any of the above-mentioned classes employing any person in this Commonwealth." 43 PA. CONS. STAT. § 260.2a. The term "wage" is defined by the WPCL as "all earnings of an [employee], regardless of whether determined on time, task, piece, commission or other method of calculation." *Id.* The WPCL additionally confers onto employees the ability to institute legal actions to collect wages payable to them by employers. *See* 43 PA. CONS. STAT. § 260.9a.

including its essential terms, that would give rise to Wieler's right to recover his alleged business expenses.

While Wieler has produced his employment contract with the Alleged Debtor, his contract hinges recovery of travel expenses upon such expenses being reasonable out-of-pocket expenses incurred during the performance of his duties for the Alleged Debtor; compliance with the Alleged Debtor's expense reimbursement policies; and the Alleged Debtor's approval of the expenses. The Court finds that Wieler has failed to produce evidence that he satisfied any of these essential terms of his employment contract. Indeed, he has failed to provide any evidence in support of the notion that his travel expenses were reasonable, that they were incurred within the performance of his duties, that he complied with the Alleged Debtor's reimbursement policies, or that the Alleged Debtor approved his expenses.[13] Rather, Wieler has only provided his own self-serving conclusory testimony that he is entitled to travel expenses from the Alleged Debtor. (*See* Doc. 144, pp. 56–58, 173.) It is well established that "[c]onclusory allegations that a plaintiff is entitled to some form of wages or expenses without further evidence that the employer actually owes those wages or expenses are insufficient to [support a claim for same]." *See Becattini v. Lutronic Corp.*, No. 19-2464, 2021 WL 5822994, at *6 (E.D. Pa. Dec. 8, 2021) (citing *Lejeck v. MBH Sols., Inc.*, No. 2:06-cv-342, 2007 WL 2743677, at *8 (W.D. Pa. Sept. 18, 2007)); *Dardaris v. Dental Org. for Conscious Sedation*, No. 06-947, 2007 WL 1300235, at *5 (E.D. Pa. May 3, 2007) (granting defendant's motion for summary judgment where the plaintiff "failed to highlight for the Court *which* commissions remain unpaid" and did "not produce[] any evidence—employment contract, receipt, or invoice—showing that she was entitled to any specific payments that she did not receive").

---

[13] The Court notes that Wieler has also failed to provide the Alleged Debtor's expense reimbursement policies.

Based on the complete lack of evidence supporting Wieler's claim for travel expenses, the Court finds that there is a bona fide dispute and/or contingency as to whether the Alleged Debtor is obligated to reimburse Wieler for these expenses. Having identified this dispute, the Court finds that Wieler has failed to establish a *prima facie* case that his travel expense claim is not contingent as to liability or subject to a bona fide dispute under § 303(b)(1). The travel expense portion of his claim will therefore be disqualified for purposes of § 303(b)(1).

Wieler's COBRA claim does not fare better. "COBRA requires employers that sponsor a group health plan for its employees to provide continuation coverage for employees who lose their coverage as a result of a qualifying event." *Glandorf v. W.G. Prods. Co.*, 31 F. App'x 772, 773 (3d Cir. 2022) (citing 29 U.S.C. § 1161). By its terms, COBRA applies only to covered employees or qualified beneficiaries who have experienced a qualifying event that caused them to lose group health insurance coverage. *See* 29 U.S.C. §§ 1161, 1166. After a qualifying event occurs, the employer must provide notice of an option to continue health insurance coverage under COBRA to the employee. 29 U.S.C. § 1166. To effectuate this notice, the qualifying employer must notify its health plan administrator within thirty days of the employee's qualifying event, and the health plan administrator must then notify the qualified employee of his or her option for extended coverage within fourteen days. *Id.*; *see also* 29 C.F.R. §§ 2590.606-2(b), 2590.606-4(b)(1). If these notice requirements are not met, the qualified employee is afforded a private right of action against the employer to recover expenses and other sums. 29 U.S.C. § 1132(c)(3).

Accordingly, for Wieler to establish his claim for health care expense recovery under COBRA, he must show that: (1) the Alleged Debtor was a "qualifying employer"; (2) Wieler was a "qualified employee"; (3) Wieler's self-described January 4, 2021 "furlough" was a

"qualifying event" that caused him to lose his group health insurance coverage; and (4) the Alleged Debtor's plan administrator failed to provide notice to Wieler of his option to continue coverage under its group health insurance plans within the time provided by COBRA. As with his travel expense claim, the Court finds that Wieler has completely failed to provide evidence that would establish any of these elements.[14] Based on this complete lack of evidence, the Court finds that there is a bona fide dispute as to whether the Alleged Debtor is liable to Wieler under COBRA. Having identified this dispute, the Court finds that Wieler has failed to establish his *prima facie* case that his claims are not contingent as to liability or subject to a bona fide dispute under § 303(b)(1). Wieler's claim will therefore be disqualified in its entirety for purposes of § 303(b)(1).

### 3. The Claim of Labanara.

Labanara classifies his claim as having three parts, all of which stem from his employment contract with the Alleged Debtor. (Doc. 165, p. 51.) First, Labanara claims that he is owed unpaid wages for the week of February 1, 2021, plus the day of February 8, 2021, in the amount of $5,215. (*Id.* at 51–52, 89, 91.) Second, Labanara asserts that he is owed the cash-equivalent of 112 hours of accrued paid time off ("PTO") in the amount of $13,776, though his

---

[14] Even if the Court were to somehow conclude that Wieler did satisfy the first three elements, his claim nonetheless fails under the fourth element as he makes no allegation regarding the identity of the plan administrator. Merely establishing the identity of one's employer does not satisfy the requirement to establish the identity of the plan administrator under COBRA. *See, e.g.*, *Crotty v. Dakotacare Administrative Servs., Inc.*, 455 F.3d 828 (8th Cir. 2006) (plaintiff's employer was not the plan administrator). The failure to identify the plan administrator can be fatal to a claim brought under COBRA. *See Weatherly v. Fall Creek Condominium Owners' Ass'n, Inc.*, No. 16-03356, 2017 WL 11068773, at *3 (W.D. Mo. June 21, 2017) (declaring a complaint defective under COBRA and dismissing same for failure to identify the plan administrator); *see also Johnson v. Dollar General*, 778 F. Supp. 2d 934, 951 (N.D. Iowa 2011) (concluding that the plaintiff's complaint was defective because it made "no allegations regarding the identity of his plan administrator," and citing additional cases).

claim seeks only $6,888 of this amount.[15]  (*Id.* at 51–52, 89–90.)  Third, Labanara alleges that he

is owed $1,063 as reimbursement for business expenses.[16]  (*Id.* at 52, 90.)

As with Wieler, to prevail on any portion of his claim, Labanara must prove the

following: (1) the existence of a contract, including its essential terms, (2) a breach of a duty

imposed by the contract, and (3) resultant damages.  *Ware*, 322 F.3d at 225; *Patel*, 427 F. Supp.

3d at 577.

In support of his claim for allegedly unpaid wages, Labanara produced his employment

contract and a paystub reflecting his typical paycheck for a two-week period.  (Proof of Claim

20-1.)  Unlike Wieler, Labanara's employment contract indicates that he was employed solely by

the Alleged Debtor, rather than the Deluxe Group.  (*See* Petitioning Creditors' Exhibit 18A.)

However, Labanara's unpaid wages claim seeks recovery of wages accrued between February 1

and February 8, 2021, a period of time that post-dates the shift of all the Alleged Debtor's

employees, including Labanara, to iBUILT.  (Doc. 216, pp. 115–16.)  Indeed, it appears that

Labanara acquiesced to this shift of employment from the Alleged Debtor to iBUILT as he

accepted stock certificates from iBUILT, transitioned to using an iBUILT email account, and

otherwise held himself out to third-parties as an iBUILT employee after the Alleged Debtor

ceased operations on December 31, 2020.  (Doc 165, pp. 44–45, 48–49, 86; Doc. 216, p. 115.)

This creates a dispute over which entity, if any, owes Labanara the alleged unpaid wages in his

---

[15] Labanara's testimony does not clarify why he only seeks a portion of the PTO that he allegedly earned.  When asked how much he was owed for allegedly unpaid PTO, he stated: "So I have a balance of PTO at 112 hours, and that's 13,776, but I -- I'm not sure if -- well, there was no on boarding.  I'm being reasonable, I don't know if things were carried over for the new year, so call it half of that, 56 hours would be 6,888."  (Doc 165, pp. 89–90.)

[16] As with Wieler's claim, Labanara's claim has evolved during this litigation.  At the time the petition was filed, Labanara had a single claim for $12,000, listed as "unpaid wages, etc."  (*See* Doc. 1, p. 3.)  In his proof of claim, Labanara's claim was listed as $9,868 for "1. One week's pay (week of 2/1/2021); 2. Remaining balance of PTO; and 3. unreimbursed expenses."  (Proof of Claim 20-1.)  It was only during his testimony at trial that Labanara indicated that his claims consisted of $20,054 for allegedly unreimbursed business expenses, wages, and paid time off.  (Doc. 165, pp. 51, 89–90, 92–93.)

claim. Therefore, the Court finds that Labanara's wage claim is subject to a bona fide dispute under § 303(b)(1). His claim for allegedly unpaid wages will accordingly be disqualified for purposes of § 303(b)(1).

Labanara's claim for allegedly unpaid PTO suffers the same fate. This portion of Labanara's claim is for $6,888 of earned, but unused PTO at the time his employment was terminated by the Alleged Debtor. (Proof of Claim 20-1.) In support of this portion of his claim, Labanara produced his employment contract which includes a provision for the accrual of PTO that states, in pertinent part: "Employee shall be entitled to three (3) calendar weeks (or 15 working days) PTO in accordance with the PTO policy of Company plus additional time off for any floating holidays where the office of the Company is closed." (Petitioning Creditors' Exhibit 18A.) Thus, Labanara's recovery of allegedly unpaid PTO hinges upon the PTO policies of the Alleged Debtor, which Labanara has failed to produce. Based on the lack of evidence showing entitlement to cash compensation for accrued, but unused PTO upon separation from the Alleged Debtor, the Court finds that there is a bona fide dispute and/or contingency as to this portion of Labanara's claim. *See Kuczeriawenko v. Patriot Buick GMC, Inc.*, No. 21-410, 2022 WL 2757365, at *4 (E.D. Pa. July 14, 2022) (noting that "[w]ithout a specific agreement or implication that accrued vacation days [are] compensable, [any] claim to such payment fails"). Labanara's claim for allegedly unpaid PTO will accordingly be disqualified for purposes of § 303(b)(1).

The final component of Labanara's claim is for allegedly unreimbursed business expenses. In support of this portion of his claim, Labanara produced his employment contract and two business expense report forms. The first expense report, dated November 16, 2020, is addressed to the Alleged Debtor and seeks recovery of $443.05 incurred between July 30, 2020

and October 21, 2020. (Proof of Claim 20-1, Attachment 1.) The second expense report, dated January 4, 2021, is addressed to iBUILT and seeks recovery of $625.68 incurred between December 7, 2020 and December 25, 2020. (*Id.*)

The Court finds that there is a bona fide dispute regarding Labanara's entitlement to recovery of the second expense report from the Alleged Debtor. As stated above, the Alleged Debtor argues that all of its employees became employees of iBUILT after midnight on January 1, 2021. (Doc. 216, pp. 115–16.) The record indicates that Labanara acquiesced to this employment arrangement. (*See* Doc 165, pp. 44–45, 48–49, 86; *see also* Doc. 216, p. 115.) Absent information regarding which liabilities the Alleged Debtor retained vis-à-vis its employees during this transition, if any, the Court cannot determine whether the Alleged Debtor is liable to reimburse Labanara for his expenses that were incurred while employed by the Alleged Debtor but submitted after he was employed by iBUILT. These unanswered questions regarding liability preclude Labanara from establishing his *prima facie* case that this portion of his claim is neither contingent as to liability nor subject to a bona fide dispute. The Court will therefore disqualify this portion of Labanara's business expense claim under § 303(b)(1).

In contrast, the Court finds that the first expense report, in which Labanara seeks reimbursement of $443.05 pertaining to expenses allegedly incurred between July 30, 2020 and October 21, 2020, is not subject to a bona fide dispute.[17] Indeed, these expenses were incurred, and the report was submitted while Labanara was still employed by the Alleged Debtor. There is no evidence that Labanara failed to follow the proper procedures to be reimbursed for these expenses or that these expenses were unreasonable or incurred outside the scope of Labanara's

---

[17] The Court notes that the header on this expense report is for Deluxe Modular, an entity affiliated with the Deluxe Group, rather than the Alleged Debtor. (Proof of Claim 20-1, Attachment 1.) However, the Alleged Debtor has not contested that this was the proper form to submit for reimbursement from the Alleged Debtor.

duties for the Alleged Debtor. To the contrary, the Alleged Debtor has not challenged this portion of Labanara's claim. Therefore, the Court finds that this portion of Labanara's expense reimbursement claim will be considered for purposes of § 303(b)(1).[18]

## B. Bad Faith[19]

The Alleged Debtor argues that Labanara filed the involuntary petition in bad faith because he failed to conduct a reasonable investigation into the other Petitioning Creditors' claims before filing the petition. (Doc. 165, pp. 64–68.) The Alleged Debtor further asserts that Labanara engaged in bad faith by filing an involuntary petition to collect on a relatively modest sum, rather than pursuing more traditional and less aggressive debt collection efforts. (*Id.* at 83.) Labanara rejoins that he filed the petition because he wanted to secure repayment of valid debts that he asserts are owed to him. (*Id.* at 52–53.) Moreover, Labanara claims that he wanted to send a message that the Alleged Debtor does not pay its debts and that others should be wary of extending credit to the Alleged Debtor. (*Id.*)

The Third Circuit has recognized that "the filing of an involuntary petition is an extreme remedy with serious consequences to the alleged debtor, such as loss of credit standing, inability to transfer assets and carry on business affairs, and public embarrassment." *In re Forever Green*, 804 F.3d at 335 (quoting *In re Reid*, 773 F.2d 945, 946 (7th Cir. 1985)) (quotation marks omitted). Therefore, the Third Circuit has held that bad faith may provide a separate basis for

---

[18] The Court notes that the Petitioning Creditors are not precluded from reasserting the full extent of their claims during the remainder of the bankruptcy proceeding, assuming that the petition is not dismissed on § 303(b) grounds.

[19] While the Alleged Debtor has argued that bad faith should disqualify all creditors' claims, the Court only considers the alleged bad faith of Labanara, since he is the only Petitioning Creditor with claims that have not been fully disqualified by the Court on § 303(b) grounds. Since bad faith can serve as an alternate basis to disqualify a creditor's claim, the Court considers the non-disqualified portion of Labanara's claim under the bad faith framework. While the Court only considers bad faith with respect to Labanara in the instant opinion, the Alleged Debtor is not precluded from re-raising the issue of bad faith in the context of a hearing under 11 U.S.C. § 303(i) in the event that the petition is dismissed.

dismissing an involuntary bankruptcy petition, even where the statutory criteria for commencing an involuntary suit are satisfied. *In re Forever Green*, 804 F.3d at 334–35. In making a bad faith determination, "creditors are presumed to have acted in good faith." *Id.* at 335. Therefore, "the debtor must show by a preponderance of the evidence that the creditors acted in bad faith." *Id.*

The Third Circuit has adopted the "'totality of the circumstances' standard for determining bad faith under § 303." *Id.* at 336. In conducting this fact-intensive review, courts may consider several non-exhaustive factors, including whether: (1) "the creditors satisfied the statutory criteria for filing the petition;" (2) "the involuntary petition was meritorious;" (3) "the creditors made a reasonable inquiry into the relevant facts and pertinent law before filing;" (4) "there was evidence of preferential payments to certain creditors or of dissipation of the debtor's assets;" (5) "the filing was motivated by ill will or a desire to harass;" (6) "the petitioning creditors used the filing to obtain a disproportionate advantage for themselves rather than to protect against other creditors doing the same;" (7) "the filing was used as a tactical advantage in pending actions;" (8) "the filing was used as a substitute for customary debt-collection procedures;" and (9) "the filing had suspicious timing." *Id.*

In this case, the Court finds that the evidence that Labanara was motivated to file the involuntary petition in bad faith is limited. Indeed, the Court finds that Labanara has satisfied the § 303(b)(1) criteria for filing the involuntary petition, at least with respect to part of his claim.[20] While there is evidence that Labanara did not research his claim or consider alternate

---

[20] The Court views the question of whether the involuntary petition was meritorious as premature in this case since there are outstanding challenges to the Court's consideration of the merits of the involuntary petition. Therefore, this factor is neutral with respect to Labanara's bad faith.

debt collection procedures before filing his claim,[21] *see* Doc. 165, pp. 57–58, there is no evidence that he joined the involuntary petition motivated by ill will or a desire to harass the Alleged Debtor.[22] Likewise, there is no evidence that Labanara sought to use the involuntary petition to gain an improper advantage for himself, or that his filing had suspicious timing. On balance, the Court finds that these factors weigh against a finding of bad faith as to Labanara.[23] Of the nine factors, only two weigh slightly in favor of Labanara's bad faith. Therefore, the Court finds that the Alleged Debtor has failed to satisfy its burden to show by a preponderance of the evidence that Labanara filed his claim in bad faith. The Court will accordingly decline to disqualify the remainder of Labanara's claim on bad faith grounds.

### C. Bad Faith Bar to Joinder.

The Alleged Debtor argues that the Court should apply the bad faith bar to joinder doctrine to preclude the Joining Creditors' claims from satisfying the requirements in § 303(b)(1) because it asserts that the Petitioning Creditors filed the involuntary petition in bad faith. (Doc. 246, pp. 12–15.)

Initially, the Court notes that the bad faith bar to joinder doctrine has not been widely utilized within the Third Circuit, and that courts applying the doctrine have limited its applicability to instances in which a **<u>single</u>** creditor has filed an involuntary petition in blatant disregard of the three-creditor requirement of § 303(b)(1). *See In re Mylotte, David &*

---

[21] Labanara testified that Frydman had threatened to "bury [him] in paperwork" if Labanara pursued litigation. (Doc. 165, p. 129.) The Court views this testimony as a justification on Labanara's part for failing to pursue customary debt collection efforts.

[22] To the contrary, Labanara described the personal financial pressures he was feeling at the time he decided to file and testified that: "There was no reasonable indication I was going to get paid without this process. . . . . So I weighed my options following February 8th. . . . . I had to take out a loan, and so I felt this was the best and expedient process. If everyone else was willing to join in, I was, too." (Doc. 165, p. 53.)

[23] The Court finds that the absence of the fourth factor, the lack of evidence of preferential payments to certain creditors or of dissipation of the Alleged Debtor's assets, is neutral in this case with respect to Labanara's bad faith.

*Fitzpatrick*, No. 07-11861, 2007 WL 2033812, at *8 (E.D. Pa. July 12, 2007) ("Accordingly, if a **sole** creditor files an involuntary petition in clear violation of section 303(b), knowing that three creditors are needed but hoping that two more will join at a later date, virtually all courts dismiss the petition as not being filed in good faith." (emphasis added)); *see also In re Forever Green*, 804 F.3d at 337–38 (declining to adopt a position regarding the bad faith bar to joinder rule); *In re Hrobuchak*, No. 5:14-bk-2098, 2015 Bankr. LEXIS 1156, at *4 (M.D. Pa. Apr. 8, 2015) (finding that "there are other methods available to address bad faith filers without punishing the properly joined creditors" in the form of the bad faith bar to joinder doctrine); *In re FKF Madison Park Group Owner, LLC*, 435 B.R. 906, 908 (D. Del. 2010) (noting the conflicting case law on the applicability of the bad faith bar to joinder doctrine and finding that the doctrine is "inconsistent with the unambiguous plain language of section 303(c), which this Court is required to construe strictly"). Therefore, the Court finds that this doctrine is facially inapplicable to the instant case as it has been applied within this circuit. Since the doctrine is inapplicable and the non-disqualified portion of Labanara's claim was not filed in bad faith, the Court declines to bar the Joining Creditors' claims under the bad faith bar to joinder doctrine.

Having determined that the Joining Creditors' claims are not barred on bad faith grounds, the Court turns to the claim of Hayes.

### D. The Claim of Hayes.

Hayes classifies his claim as having two parts, both of which stem from his employment contract with the Alleged Debtor. (Doc. 217, p. 85.) First, Hayes asserts that he is owed unpaid wages in the amount of either $2,100 or $5,500.[24] (Proof of Claim 31-1; Proof of Claim 32-1;

---

[24] The Court notes that there appears to be some confusion on Hayes' part as to the extent of his claim. It appears that Hayes executed a proof of claim on March 24, 2021, which indicates a total claim of $33,500 for "unpaid wages and un-reimbursed expenses[,]" of which $5,500 was for unpaid wages. (Doc. 87-6.) However, this proof of claim does not appear in the Court's claims registry, and it does not appear to have been docketed other than as an exhibit in

22

Doc. 237, p. 204.)  Second, Hayes claims that he is owed either $23,234.18 or $28,000 for "court reporter fees and expenses incurred at the Debtor's instruction, submitted for reimbursement but not reimburs[ed]."  (Proof of Claim 31-1; Proof of Claim 32-1; Doc. 237, p. 204.)

As with Wieler and Labanara, in order prevail on either aspect of his claim, Hayes must prove the following: (1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract, and (3) resultant damages. *Ware*, 322 F.3d at 225; *Patel*, 427 F. Supp. 3d at 577.

With respect to Hayes' unpaid wages claim, while he has produced his employment contract with the Deluxe Group, he has provided no evidence regarding a breach of same.  (*See* Doc. 237, pp. 206–07 ("Q: [Y]ou didn't attach any pay stubs or any other documents to your proof of claim to substantiate that claim, right, Mr. Hayes? . . . . A: I don't recall filing any pay stubs. . . . . Q: And you don't recall filing any contracts either, right, appending any contracts on your proofs of claims, right?  A: No, I did not.").)  Nor has he produced any evidence that he was employed by the Alleged Debtor and not some other member of the Deluxe Group during the time relevant to his unpaid wage claims.  As the Court has already stated, "[c]onclusory allegations that a plaintiff is entitled to some form of wages or expenses without further evidence that the employer actually owes those wages or expenses are insufficient to [support a claim for same]."  *See Becattini*, 2021 WL 5822994, at *6 (citing *Lejeck*, 2007 WL 2743677, at *8); *Dardaris*, 2007 WL 1300235, at *5 (granting defendant's motion for summary judgment where the plaintiff "failed to highlight for the Court *which* commissions remain unpaid" and did "not

---

response to an order to show cause.  (*See id.*)  During Hayes' trial testimony, when asked about his claim, there appeared to be a misunderstanding and some degree of confusion as to which proof of claim he was pursuing. (*See* Doc. 237, pp. 203–09 ("Q: I believe you're conflating your claim which was filed on the claim register, not this document. A: Okay.  Well, I'm sorry, I recall gathering, checking, and filing the supporting documentation for -- for the unreimbursed expenses, and I don't recall filing any pay stubs.").)  This confusion does not appear to have been resolved on the record.

23

produce[] any evidence—employment contract, receipt, or invoice—showing that she was entitled to any specific payments that she did not receive").  Indeed, the only evidence that Hayes is entitled to unpaid wages is his own self-serving testimony, which is insufficient to support his burden of proof at this stage.  Based on the complete lack of evidence supporting Hayes' claim for allegedly unpaid wages, the Court finds that there is a bona fide dispute as to whether the Alleged Debtor is obligated to pay Hayes for these wages.  Having identified this dispute, the Court finds that Hayes has failed to establish a *prima facie* case that his unpaid wage claim is not contingent as to liability or subject to a bona fide dispute under § 303(b)(1).  His wage claim will therefore be disqualified for purposes of § 303(b)(1).

Hayes' business expense claim meets the same fate.  This portion of Hayes' claim stems from a series of invoices for court reporting fees and expenses.[25]  (Proof of Claim 32-1.)  Hayes' employment contract includes the same term regarding reimbursement of business expenses as Wieler's employment contract.  (Doc. 150-5, p. 3 ("The Company shall, subject to approval, cover Hayes' reasonable out-of-pocket expenses, incurred in the performance of Hayes' Company Duties in accordance with the Company's expense reimbursement policies in effect from time to time.").)  Thus, as with Wieler's claim for travel expenses, Hayes' contract provisions hinge recovery of business expenses upon such expenses being reasonable out-of-pocket expenses incurred during the performance of his duties for the Alleged Debtor;

---

[25] As with his claim generally, Hayes' trial testimony was equivocal regarding the extent of his business expense claim.  Specifically, Hayes testified that: "Exhibit 32 is a claim for reimbursement of court reporter fees, although -- well, it is for cases that were done relating to the debtor.  However, I seem to have attached all of the Veritext invoices, although I have a recollection of trying to add up only the amounts that were invoices for Deluxe itself in the actual amount of the claim.  So I hope I got that right, but if I -- I'm just -- I'm seeing things here that are -- and there are two that are for an entirely different client. . . . .  I'm not sure why they're there, except that I had a set of Veritext invoices."  (Doc. 217, p. 85.)  Indeed, the Court notes that several of the invoices either pertain to matters for which the Alleged Debtor is not a party and thus may not be liable at all or are matters in which the Alleged Debtor and a separate Deluxe Group entity, Deluxe Building Construction, LLC, are both plaintiffs, and could therefore be jointly and severally liable.  (*See* Proof of Claim 32-1, Attachment 1.)

compliance with the Alleged Debtor's expense reimbursement policies; and the Alleged Debtor's approval of the expenses. The Court finds that Hayes has failed to produce evidence that he satisfied any of these essential terms of his employment contract. Indeed, he has failed provide any evidence in support of the notion that his expenses were reasonable, that they were incurred within the performance of his duties for the Alleged Debtor, that he complied with the Alleged Debtor's reimbursement policies, or that the Alleged Debtor approved his expenses. Rather, Hayes has only provided his own general self-serving testimony that he is entitled to reimbursement of business expenses from the Alleged Debtor, despite acknowledging that these expenses were never approved. (*See* Doc. 237, pp. 211–12 ("I had submitted them for reimbursement to the company, and received no response.")[26].) As with Wieler's claim, Hayes' business expense claim will likewise be disqualified for failure to establish his *prima facie* case that his claim is not contingent as to liability or subject to a bona fide dispute under § 303(b)(1).

---

[26] The Court notes that Hayes has failed to produce any proof that these claims were submitted to the Alleged Debtor for reimbursement.

## IV. CONCLUSION

For the foregoing reasons, the Court disqualifies the claims of T&P, Superior, and Wieler under 11 U.S.C. § 303(b)(1) because they are subject to a bona fide dispute or are contingent as to liability or amount. The Court likewise disqualifies all but $443.05 of Labanara's claim for the same reasons and because the Court finds that Labanara's claim was not filed in bad faith. The Court will consider the claims of the remaining Joining Creditors because it has declined to apply the bad faith bar to joinder in this case. A scheduling order will issue to set an additional hearing date to determine if the requirements of 11 U.S.C. §§ 303(b) and (h) can be satisfied with the inclusion of the Joining Creditors pursuant to 11 U.S.C. § 303(c).

By the Court,

_____
Henry W. Van Eck, Chief Bankruptcy Judge
Dated: October 28, 2022