**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE: | : | |
| | : | CHAPTER 7 |
| DELUXE BUILDING SOLUTIONS, LLC, | : | |
| | : | CASE NO. 5:21-bk-00534-HWV |
| Alleged Debtor. | : | |

## MEMORANDUM OPINION

     This matter comes before the Court on the second phase of a Motion to Dismiss the Involuntary Chapter 7 Petition filed by the Alleged Debtor, Deluxe Building Solutions, LLC (the "Alleged Debtor"). (Doc. 120.) For the following reasons, the Court will deny the requested relief.

### I. JURISDICTION

     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) (matters concerning the administration of the estate).

### II. FACTUAL BACKGROUND AND PROCEDURAL POSTURE[1]

     As established during the first phase of hearings on the Motion to Dismiss, the Alleged Debtor is a United States-based manufacturer of large-scale commercial volumetric steel modular buildings formerly operating out of Berwick, Pennsylvania. (Doc. 121-2, p. 15.)[2] The Alleged Debtor is affiliated with a larger group of companies that focus on various aspects of architecture, engineering and construction software, technologies, and other innovations collectively known as the "Deluxe Group." (*Id.*) Frydco Capital Group, LLC ("Frydco") and

---

[1] The Court has issued a prior opinion in this case and incorporates the factual background from same. (Doc. 268.) Additional facts are included only where necessary for the analysis below.

[2] For ease of reference, and where appropriate, the Court utilizes the page numbers from the CM/ECF footer.

Winter Investors, LLC ("Winter") owned all interests in the Alleged Debtor through December 31, 2020, after which iBUILT Group, LLC ("iBUILT") became the owner of same. (Doc. 165, pp. 169, 210; Doc 216, p. 147.) Jacob Frydman ("Frydman") controls the Alleged Debtor as its designated Manager. (Doc. 121-2, p. 15.)

SyncPark, LLC ("SyncPark") is a Delaware limited liability company with an address at 4 South Stanwich Road, Greenwich, Connecticut. (*Id.* at 3, 54.) SyncPark was formed to develop a system that moves vehicles through an automated self-parking facility using linear synchronous motor technology (the "SyncPark System"). (*Id.* at 15.) Andrew W. Hayes ("Hayes") and James G. Wieler ("Wieler") own and control SyncPark. (Doc. 144, p. 41; Doc. 242, p. 22.)

In early 2020, the Alleged Debtor and SyncPark entered a joint venture to design, manufacture, and build automated self-parking garages modeled after the SyncPark System throughout the United States. (Doc. 121-2, p. 16.) To that end, on April 29, 2020, the Alleged Debtor and SyncPark entered into an operating agreement (the "JV Operating Agreement") to form a joint venture, which they named SyncPark USA, LLC (the "Joint Venture"). (*See* Doc. 121-2.) According to the JV Operating Agreement, Frydman and Hayes were non-member managers of the Joint Venture, and Wieler and Hayes were its executives. (*Id.* at 3.) As its managers, Frydman and Hayes made up the Board of the Joint Venture. (*Id.* at 33.)

By agreement, the Alleged Debtor and SyncPark were each required to make an initial capital contribution in exchange for their ownership interest in the Joint Venture. (*Id.* at 16.) SyncPark's initial capital contribution to the Joint Venture included all its rights, title, license, and interest in and to the SyncPark System, and all the other assets it owned in exchange for a 50% membership interest in the Joint Venture. (*Id.* at 16, 20.) The Alleged Debtor's initial

2

capital contribution included an in-kind contribution of: (1) space in one of its buildings in Berwick, Pennsylvania, for use by the Joint Venture; (2) certain design services, components, and construction work, each as defined in the JV Operating Agreement; and (3) a commitment to fund necessary purchases and engineering work that it or other entities in the Deluxe Group could not manufacture or provide; all in exchange for a 50% membership interest in the Joint Venture. (*Id.*) This funding commitment was capped by the JV Operating Agreement at approximately $500,000, with the precise amount to be identified in a budget prepared by Wieler and Hayes and submitted to the Board for approval. (*Id.* at 20, 33.)

To advance the Joint Venture's purpose, the Joint Venture's members and executives decided to build a test garage using the SyncPark System as a proof of concept for investors (the "POC Garage"). (*Id.* at 15.) Despite apparent efforts to build the POC Garage, Frydman admits the Alleged Debtor had difficulty doing so because of its financial struggles throughout its relationship with the Joint Venture. (Doc. 165, pp. 216–17.) According to Frydman, the original members of the Alleged Debtor, Winter and Frydco, invested approximately $31 million to support the Alleged Debtor from January 2018 through December 31, 2020. (*Id.* at 216.) While there was evidence that the Joint Venture could become profitable, in Winter and Frydco's view, the Alleged Debtor's significant financial deficit eventually outweighed the promise held by the Joint Venture. (*Id.* at 216–17.) Thus, effective December 31, 2020, Frydman asserts that Winter and Frydco transferred all their ownership interests in the Alleged Debtor to a newly formed member of the Deluxe Group called iBUILT. (Doc. 165, p. 210; Doc. 216, p. 147.) Contemporaneously, Frydman asserts that the Alleged Debtor also transferred its employees to iBUILT to continue its limited operations, causing the Alleged Debtor to effectively cease all

operations as of December 31, 2020.[3]  (Doc. 165, pp. 210, 217; Doc. 216, pp. 115–16, 121–22; Doc. 245, ¶¶ 123–24.)

To enable what some have called a "brand refresh," or a transition of the Alleged Debtor to iBUILT, the Alleged Debtor contracted with Ana Michelle Matthews Andreotti ("Andreotti") to design an "End-to-End Platform Infographic."  (Doc. 319, p. 166; PC Ex. 36.)  This infographic was created to demonstrate the operations of iBUILT in pictorial form.  (Doc. 319, pp. 144–45.)  Andreotti's work occurred during the week of November 16, 2020, and was completed by November 20, 2020, with an invoice for $5,000 issued by Andreotti on the completion date.  (PC Ex. 35; PC Ex. 36.)

After transitioning to iBUILT, Frydman asserts that iBUILT began to furlough or lay off most employees transferred to it from the Alleged Debtor.  (Doc. 144, p. 58; Doc. 165, p. 106; Doc. 216, pp. 115–16; Doc. 217, p. 108.)  As a result of these events, and because the Alleged Debtor was not operating in the traditional sense, the Alleged Debtor ceased payment on many of its financial obligations, including the amount owed to Andreotti, while waiting for its only source of income from receivables and anticipated litigation payouts to arrive.  (Doc. 216, pp. 100–01.)  Another such casualty was a sublease obligation with Underscore Marketing, LLC ("Underscore Marketing").  While the sublease term ran from July 2019 until June 2021, the Alleged Debtor did not make payments on this obligation after April 2020.[4]  (*See* PC Ex. 7, p. 2; Doc. 325, pp. 75, 79; PD Ex. 23.)

---

[3] After December 31, 2020, the Alleged Debtor continued operating solely to collect outstanding receivables, including potential recoveries from pending litigation, and pay as many of its liabilities as possible.  (Doc. 165, p. 216.)

[4] Frydman testified that sublease payments did not occur because of the COVID-19 pandemic, which served to deny the Alleged Debtor access to the leased premises due to large-scale shutdown orders in New York during this time.

4

On March 18, 2021, Taylor & Peterson ("T&P"), Superior Controls, Inc. ("Superior"),

Robert Labanara ("Labanara"), and Wieler (collectively, the "Petitioning Creditors") filed an

involuntary bankruptcy petition under 11 U.S.C. § 303 against the Alleged Debtor seeking to

recover debts allegedly owed to them by the Alleged Debtor. (Doc. 1.) After that, and on

various dates from December 9, 2021, until January 7, 2022, Central Builders Supply, Andreotti,

Underscore Marketing, Ava Rae Flamish ("Flamish"), Scott Robbins ("Robbins"), and Joseph

Styczynski ("Styczynski") (collectively, "Joining Creditors") joined in the involuntary petition as

petitioning creditors. (Docs. 147, 148, 149, 151, 152, 161.)

The Alleged Debtor filed the instant Motion to Dismiss on September 2, 2021. (Doc.

120.) The Petitioning Creditors filed their Objection to the Motion on September 22, 2021.

(Doc. 133.) The Court held seven non-consecutive days of evidentiary hearings on the Motion to

Dismiss and Objection between September 23, 2021 and February 24, 2022,[5] during which the

Court heard testimony from the following witnesses: (1) Wieler; (2) Alastair Taylor, one of the

owners of T&P; (3) Labanara; (4) Frydman; (5) Rick Pierro, the President of Superior; and (6)

Hayes.[6] (*See* Docs. 144, 164, 165, 216, 217, 237, 242.) Following briefing, the Court issued a

Memorandum Opinion and Order denying the Motion in part, subject to future evidentiary

hearings on the Joining Creditors' claims. (Docs. 268, 269.)

As provided by the Court's Memorandum Opinion and Order, the Court conducted phase

two of the hearings on the Motion to Dismiss and Objections over three non-consecutive days of

---

[5] The Court conducted hearings on September 23, December 15, and December 16, 2021, and on January 19, January 20, February 2, and February 24, 2022. (Docs. 144, 164, 165, 216, 217, 237, 242.)

[6] On September 23, 2021, the morning of the first day of trial, Hayes joined the Petitioning Creditors by asserting a claim against the Alleged Debtor. Though not a Petitioning Creditor, Hayes testified on their behalf to defend the assertion that bad faith is not present in this case. While doing so, Hayes also testified in defense of his claim.

5

evidentiary hearings between February 1, 2023, and April 19, 2023,[7] during which the Court

heard testimony from the following witnesses: (1) Lauren Boyer, the CEO of Underscore

Marketing; (2) Susan Armstrong, the Treasurer for Central Builders Supply Company; (3)

Andreotti; (4) Flamish; (5) Robbins; (6) Styczynski; and (7) Frydman.  (*See* Docs. 319, 320,

325.)  The Court permitted post-hearing briefing, which the parties have completed.  (Docs. 327,

332, 334.)  Finally, the Court conducted oral argument on August 8, 2023.  (Doc. 335.)  The

remainder of the Motion is therefore ripe for the Court's review.

## III.  ANALYSIS

At this stage in the case and regarding the Court's consideration of the Motion to

Dismiss, there is only one issue remaining before the Court: whether the Joining Creditors have

standing to file the involuntary petition against the Alleged Debtor under 11 U.S.C. § 303(b) and,

if so, whether the Alleged Debtor is generally not paying its debts as they become due as

referenced in 11 U.S.C. § 303(h).

As explained during the first phase of this case, where an alleged debtor has twelve or

more creditors, as is the case here, Section 303(b)(1) contains three requirements for

commencing an involuntary action against the alleged debtor: (1) there must be three or more

petitioning creditors; (2) each petitioning creditor must hold a claim against the alleged debtor

that is not contingent as to liability or the subject of a bona fide dispute; and (3) the claims must

aggregate at least $16,750 more than the value of the liens on the alleged debtor's property.  11

U.S.C. § 303(b)(1); *In re Forever Green Athletic Fields, Inc.*, 804 F.3d 328, 333 (3d Cir. 2015);

*In re Raymark Industries, Inc.*, 99 B.R. 298, 299 (E.D. Pa. 1989) (citing 11 U.S.C. § 303(b)(1)).

The initial burden is on the petitioning creditors to establish each element of Section 303(b)(1),

---

[7] The Court conducted hearings on February 1–2, 2023, and April 19, 2023.  (Docs. 315, 316, 321.)

including a *prima facie* case that their claims are not contingent as to liability or subject to a bona fide dispute. *In re Graber*, 319 B.R. 374, 377 (E.D. Pa. 2004). If satisfied, the burden then shifts to the alleged debtor to rebut same and, when necessary, to establish the existence of a contingency or a bona fide dispute. *In re VitaminSpice*, 472 B.R. 282, 290 (E.D. Pa. 2012).

A claim is the subject of a bona fide dispute if "there is a genuine issue of a material fact that bears upon the debtor's liability, or a meritorious contention as to the application of law to undisputed facts." *B.D.W. Assocs., Inc. v. Busy Beaver Bldg. Ctrs., Inc.*, 865 F.2d 65, 66 (3d Cir. 1989) (quotation marks omitted). Therefore, the evaluating court must determine whether there is an objective basis for either a factual or a legal dispute as to the validity of the debt. *Id.* The court is not required to resolve the dispute—only to identify its presence or absence. *Id.* If the court determines that a bona fide dispute exists, it must disqualify the claim and dismiss the petition if appropriate. *Id.*

A claim is contingent as to liability if "the debt is one which the debtor will be called upon to pay only upon the occurrence or happening of an extrinsic event which will trigger the liability of the debtor to the alleged creditor and if such triggering event or occurrence was one reasonably contemplated by the debtor and creditor at the time the event giving rise to the claim occurred." *In re Raymark Industries, Inc.*, 99 B.R. at 301 (quoting *In re All Media Properties, Inc.*, 5 B.R. 126, 133 (S.D. Tex. 1980), *aff'd*, 646 F.2d 193 (5th Cir. 1981)).

The Court observes that the Alleged Debtor does not dispute that this case was commenced by three or more entities, each of which argue that they are the holder of a claim against the Alleged Debtor and that such claims, if allowed, are asserted to aggregate at least $16,750 more than the value of any lien on property of the Alleged Debtor securing such claims. (Doc. 144, pp. 29–36.) However, the Alleged Debtor does dispute the Joining Creditors'

assertion that their claims are not subject to a bona fide dispute or contingent as to liability. (Doc. 327, p. 4.) Moreover, the Alleged Debtor asserts that it is still paying its debts as they come due as required by Section 303(h). (Doc. 334, pp. 6–8.) The Alleged Debtor thus argues that the Joining Creditors lack standing to bring the instant involuntary petition.

To the extent necessary, the Court considers these arguments below regarding the remaining Joining Creditors' claims.

### A. The Claim of Underscore Marketing.

Underscore Marketing bases its claim on the Alleged Debtor's failure to pay rent allegedly owed under a sublease agreement between Underscore Marketing and the Alleged Debtor. (Proof of Claim 19-2; Proof of Claim 26-2.) As evidence of its claim, Underscore Marketing references a default judgment entered against the Alleged Debtor on April 26, 2021 in the Supreme Court of New York, New York County, as well as the terms of the sublease agreement between Underscore Marketing and the Alleged Debtor. (Proof of Claim 19-2, Attachments 3–8; Proof of Claim 26-2, Attachment 1; *see also* Doc. 332, pp. 5–14.)

The Alleged Debtor counters that the judgment obtained by Underscore Marketing is void *ab initio* since it was obtained in violation of the automatic stay and does not otherwise satisfy an exception to the provisions of the automatic stay. (Doc. 327, pp. 14–16.) In addition, while the Alleged Debtor does not dispute the existence of the sublease agreement as a contract between itself and Underscore Marketing, it does assert that the sublease contained terms that would allow the Alleged Debtor to abate or otherwise offset its payment of rent during its period of occupancy. (*Id.* at 16–19.) Therefore, the Alleged Debtor argues that Underscore Marketing's claim is subject to a bona fide dispute and is contingent as to the amount of liability.

The Court considers these arguments below.

1. **Underscore Marketing's Default Judgment Cannot Support its Claim for Purposes of Section 303(b).**

The instant case commenced on March 18, 2021. (Doc. 1.) As of this date, the automatic stay provisions of 11 U.S.C. § 362 took effect. As explained by the Court of Appeals for the Third Circuit,

> The purpose of the automatic stay is twofold: (1) to protect the debtor, by stopping all collection efforts, harassment, and foreclosure actions, thereby giving the debtor a respite from creditors and a chance "to attempt a repayment or reorganization plan or simply be relieved of the financial pressures that drove him into bankruptcy;" and (2) **to protect "creditors by preventing particular creditors from acting unilaterally in self-interest to obtain payment from a debtor to the detriment of other creditors**." [*Maritime Electric Co. v. United Jersey Bank*, 959 F.2d 1194, 1204 (3d Cir. 1991)].

> The stay is "automatic" because it is triggered upon the filing of a bankruptcy petition **regardless of whether the other parties to the stayed proceeding are aware that a petition has been filed**. The automatic stay cannot be waived. Relief from the stay can be granted only by the bankruptcy court having jurisdiction over a debtor's case. *Id.* . . . .

> The automatic stay is of broad scope, directing that "all judicial actions against a debtor seeking recovery on a claim that were or could have been brought before commencement of a bankruptcy case, are automatically stayed." *Maritime*, 959 F.2d at 1203, 1206. Thus, "once triggered by a debtor's bankruptcy petition, the automatic stay suspends any non-bankruptcy court's authority to continue judicial proceedings then pending against the debtor." *Id.* at 1206. Unless relief from the stay is granted, the stay continues until the bankruptcy case is dismissed or closed, or discharge is granted or denied. 11 U.S.C. § 362(c). Once a stay is in effect, **without relief from the bankruptcy court, "the parties themselves cannot validly undertake any judicial action material to the . . . claim against" the debtor**. *Id.* at 1207.

*Constitution Bank v. Tubbs*, 68 F.3d 685, 691–92 (3d Cir. 1995) (emphasis added).

Because the automatic stay prevents unilateral action by certain creditors over others, it is well-settled that "actions taken in violation of the automatic stay are void *ad initio*." *Raymark Industries, Inc. v. Lai*, 973 F.2d 1125, 1132 (3d Cir. 1992) (citing *Kalb v. Feuerstein*, 308 U.S. 433, 438–40 (1940); *In re Ward*, 837 F.2d 124, 126 (3d Cir. 1988)). This is true regardless of

9

whether the creditor who violated the stay did so knowingly. *See O'Connell v. Marshalls, Inc.*, No. 17-2438, 2017 U.S. Dist. LEXIS 192682, at *12 (E.D. Pa. Nov. 21, 2017) (citing *Richard v. City of Chicago*, 80 B.R. 451, 453 (N.D. Ill. 1987) ("tax sale of Chapter 13 debtors' property in violation of automatic stay was void *ab initio*, regardless of whether creditor knew of bankruptcy petition")); *see also Frankel v. Strayer* (*In re Frankel*), 391 B.R. 266, 275 (Bankr. M.D. Pa. 2008) ("[E]ven if a creditor is initially unaware of the automatic stay, the creditor has an affirmative duty to stop or correct actions that continue to violate the stay once the creditor is made aware of the stay." (quoting *In re Glanzer*, 2008 WL 938590, at *2 (Bankr. N.D. Ohio 2008)).[8] Thus, Underscore Marketing's April 26, 2021 judgment, entered after this case commenced, would ordinarily be deemed void as a matter of law. *See Tubbs*, 68 F.3d at 692 ("Several courts have applied the void *ab initio* rule to nullify judgments entered after a stay has been triggered, even when the only action left for the court was to enter the judgment.") (collecting cases). However, Underscore Marketing asserts that its April 26, 2021 judgment should survive this ordinary fate under the "ministerial act exception" to the automatic stay provisions of Section 362. (Doc. 332, pp. 5–8.)

Most circuits recognize the ministerial act exception as a common law defense to an automatic stay violation as to "certain post-petition enforcement actions." *Toppin v. Williams* (*In re Toppin*), 645 B.R. 773, 785 (Bankr. E.D. Pa. 2022). As the Eastern District has explained,

> Ministerial acts are those that are simple, routine, clerical, or automatic but 'exclude[ actions] involving deliberation, discretion, or judicial involvement". *In re Soares*, 107 F.3d 969, 974 (1st Cir. 1997) ("Such acts can usefully be visualized

---

[8] In a footnote, the Alleged Debtor invites the Court to impose actual and punitive damages against Underscore Marketing for its failure to engage in remedial measures after obtaining the April 26, 2021 judgment in violation of the stay. (*See* Doc. 327, p. 15 n.10.) The Court will decline this invitation as it has heard no evidence or testimony that would tend to establish the elements required to award actual or punitive damages under 11 U.S.C. § 362(k) and because there is otherwise no pending motion seeking such relief. *See Kaushas v. Popple Constr., Inc.* (*In re Kaushas*), 616 B.R. 57, 63 (Bankr. M.D. Pa. 2020) (citing *Linsenbach v. Wells Fargo Bank* (*In re Linsenbach*), 482 B.R. 522, 526 (Bankr. M.D. Pa. 2012) (setting forth the elements for a willful violation of the automatic stay sufficient to give rise to a claim for damages)).

as the antithesis of judicial acts, inasmuch as the essence of a judicial act is the exercise of discretion or judgment"); *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 527 (2d Cir. 1994); *In re Knightsbridge Dev. Co. Inc.*, 884 F.2d 145, 148 (4th Cir. 1989) (finding "ministerial function . . . condones only rote post-petition activity"); *In re Fillion*, 181 F.3d 859, 861 (7th Cir. 1999); *In re Pettit*, 217 F.3d 1072, 1080 (9th Cir. 2000) ("Ministerial acts or automatic occurrences that entail no deliberation, discretion, or judicial involvement do not constitute continuations of such a proceeding."); *Roberts v. Comm'r*, 175 F.3d 889, 897 (11th Cir. 1999).

*In re Toppin*, 645 B.R. at 785–86.

While the Third Circuit has not explicitly adopted the ministerial act exception to the automatic stay provisions, "it has discussed actions that qualify as ministerial, such as delivering a deed which conveys legal title that is 'routinely performed [and] does not affect the redemption rights of the parties.'" *Id.* at 786 (quoting *In re Connors*, 497 F.3d 314, 321 (3d Cir. 2007)). Moreover, various courts within the Third Circuit have recognized and applied the exception. *See, e.g.*, *Kipps v. Stincavage-Kipps* (*In re Kipps*), No. 5:19-bk-1662, 2022 Bankr. LEXIS 852, at *25–26 (Bankr. M.D. Pa. Mar. 31, 2022) (J. Conway) (applying the ministerial act exception in the context of deed execution); *In re Toppin*, 645 B.R. at 785–86 (discussing the ministerial act exception); *In re Solar Trust of Am., LLC*, No. 12-11136, 2015 Bankr. LEXIS 76, *9 (Bankr. D. Del. Jan. 12, 2015) (finding that entry of an order awarding of attorneys' fees under a German statute that bases fees on the amount in controversy is not a ministerial act); *In re ABC Learning Centers Ltd.*, 445 B.R. 318, 338 (Bankr. D. Del. 2010) ("Reducing a verdict to judgment is usually a simple ministerial task that does not constitute the continuation of a judicial proceeding, which would be stayed under § 362(a)(1)."); *Chase Manhattan Bank v. Pulcini* (*In re Pulcini*), 261 B.R. 836, 841 (Bankr. W.D. Pa. 2001) (finding that a sheriff's actions in delivery of a deed "arose out of laws and/or judicial decrees with such 'crystalline clarity' that nothing was left to the sheriff's discretion or judgment[,]" and thus constituted a ministerial act) (quoting *In re Soares*, 107 F.3d at 974); *Electric M & R v. Aultman* (*In re Aultman*), 223 B.R.

481, 485 (Bankr. W.D. Pa. 1998) (finding that "in Pennsylvania, the mere entry of a judgment upon a state court docket by the state court prothonotary is a purely ministerial act") (citing *Lansdowne v. G.C. Murphy Co.*, 517 A.2d 1318, 1321 (Pa. Super. Ct. 1986); *Gotwalt v. Dellinger*, 577 A.2d 623, 625 (Pa. Super. Ct. 1990)).

New York recognizes the ministerial act exception in similar circumstances as the Third Circuit. As the Second Circuit Court of Appeals explained, "[t]he 'ministerial act' exception represents an exceedingly narrow category of actions that avoid the automatic stay." *Bayview Loan Servicing LLC v. Fogarty* (*In re Fogarty*), 39 F.4th 62, 77 (2d Cir. 2022). Under New York law, the "entry of a judgment on the court docket" by a court clerk is one such act that qualifies for the ministerial act exception from the automatic stay. *Rexnord Holdings, Inc.*, 21 F.3d at 528 (finding that the court clerk's entry of judgment after the trial court directed its entry was ministerial). "Similarly, 'the delivery of the deed' to a property that has already been sold in foreclosure is properly treated as a 'ministerial act' for automatic stay purposes, *In re Rodgers*, 333 F.3d 64, 69 (2d Cir. 2003), as is the 'issuance of the writ of possession after strict foreclosure,' *In re Canney*, 284 F.3d 362, 375 (2d Cir. 2002)." *In re Fogarty*, 39 F.4th at 77. However, affirmative actions by counsel do not qualify for the ministerial act exception. *See In re Dominguez*, 312 B.R. 499, 503–04 (Bankr. S.D.N.Y. 2004) (finding that where counsel filed an affirmation that the state court relied upon in rendering its judgment, counsel engaged in "substantive acts" resulting in the "continuation . . . of a judicial, administrative, or other action or proceeding against the debtor'" in violation of the automatic stay).

In this case, the Supreme Court of New York, New York County, entered an order granting a motion for default judgment and directing the entry of judgment on March 9, 2021 (PC Ex. 4.) This order states, in pertinent part, that:

> [T]he Clerk is directed to enter judgment in favor of plaintiff in the sum of $253,257.48, with interest at the contracted rate of 6.5% per annum from May 1, 2020, until entry of judgment, together with costs and disbursements, as taxed by the Clerk[.]

(PC Ex. 4.) Thereafter, from the Court's review of the public docket for the Supreme Court of New York, New York County,[9] it appears that an attorney for Underscore Marketing submitted an affirmation and proposed judgment on April 15, 2021. On April 26, 2021, the clerk proceeded to enter judgment. (*Id.*) However, it is unclear from the record whether the clerk exercised discretion in entering judgment, thus potentially rendering the ministerial act exception inapplicable.

Specifically, the Court notes that certain portions of the judgment are crossed off, and other areas have blanks filled in with a different font. Indeed, at oral argument, counsel for the Alleged Debtor aptly described the judgment as a "mad libs style document." By way of example, the judgment states:

> **NOW**, **THEREFORE**, it is hereby
>
> **ADJUDGED** that Plaintiff UNDERSCORE MARKETING, LLC have judgment and recover against Defendant DELUXE BUILDING SOLUTIONS, LLC, in the sum of $253,257.48, with interest at the contracted rate of 6.5% per annum from May 1, 2020, ~~until entry of judgment,~~ totaling **$16,236.23** ~~in prejudgment interest,~~ together with costs and disbursements, as taxed by the Clerk, totaling **waived**, for a total judgment in the amount of **$269,493.71** and that Plaintiff UNDERSCORE MARKETING, LLC shall have due execution thereof.
>
> DATED: **26th Apr. 2021**

(PC Ex. 6 (reproduction approximated).) In addition, the caption on the judgment has the word "proposed" crossed off. At oral argument, Petitioning Creditors' counsel did not know whether

---

[9] The Court may take judicial notice of other court's dockets under *Wilson v. McVey*, 579 F. Supp. 2d 685, 688 (M.D. Pa. 2008) (taking judicial notice of court docket). *See also S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Group Ltd.*, 181 F.3d 410, 426 (3d Cir. 1999) (stating that courts "may take judicial notice of another court's opinion— not for the truth of the facts recited therein, but for the existence of the opinion, which is not subject to reasonable dispute over its authenticity").

an attorney for Underscore Marketing had submitted this judgment or if it was drafted by the clerk for the Supreme Court of New York, New York County. Moreover, the Court did not hear any testimony or evidence regarding whether the waiver of "costs and disbursements, as taxed by the Clerk" was discretionary (i.e., left to individual choice or judgment of the Clerk or judicial officer) or mandatory (i.e., required by law or otherwise obligatory). Likewise, it is unclear to the Court whether the act of apparently crossing out portions of the judgment involved the exercise of discretion.

In light of these ambiguities, the Court is unable to determine whether the act of entering the April 26, 2021 judgment was such a "simple, routine, clerical, or automatic" act that did not involve "deliberation, discretion, or judicial involvement[.]" *In re Toppin*, 645 B.R. at 785 (internal quotation marks omitted). Thus, it is unclear whether the entry of the judgment was a ministerial act sufficient to except its entry from a violation of the automatic stay. Therefore, the Court will not consider the April 26, 2021 judgment in support of Underscore Marketing's claim for Section 303(b) purposes, as it may be void *ab initio*.[10]

Having determined that Underscore Marketing's judgment cannot support its claim for Section 303(b) purposes, the Court considers whether the plain language of the sublease between itself and the Alleged Debtor gives rise to a claim for unpaid rent that is "not contingent as to liability or the subject of a bona fide dispute." 11 U.S.C. § 303(b)(1).

### 2. The Terms of the Sublease Agreement Support Underscore Marketing's Claim Against the Alleged Debtor.

The second portion of Underscore Marketing's claim arises from an alleged breach of contract by the Alleged Debtor. To establish a cause of action for breach of contract under New

---

[10] The Court need not determine whether this judgment is void for Section 303(b) analysis purposes. Indeed, it is sufficient to state that Underscore Marketing has failed to satisfy the Court that it possesses a valid judgment not subject to a bona fide dispute that the Court could consider in support of its claim.

York law,[11] Underscore Marketing must prove the following: "(1) an agreement, (2) adequate performance by the plaintiff, (3) breach by the defendant, and (4) damages." *Donohue v. Cuomo*, 980 F.3d 53, 67 (2d Cir. 2020) (quoting *Fischer & Mandell, LLP v. Citibank, N.A.*, 632 F.3d 793, 799 (2d Cir. 2011)).

The Alleged Debtor does not dispute the existence of the contract between itself and Underscore Marketing in the form of the sublease agreement; however, it does dispute that it breached the terms of this sublease by failing to pay rent from May 2020 until the end of the lease's term on June 29, 2021. (*See* PC Ex. 7, p. 2.) The Alleged Debtor asserts that the COVID-19 pandemic, which necessitated the large-scale shutdown of all non-essential businesses and buildings in New York City during this time, resulted in an abatement of the Alleged Debtor's rent obligation from March 2020 until the termination of the sublease under section 24 of the sublease. (Doc. 327, pp. 17–18.) The Alleged Debtor also argues that Underscore Marketing's failure to turn over certain furniture, fixtures, and equipment ("FF&E") located in the leased building gives rise to a counterclaim against Underscore Marketing, which creates a contingency as to the amount of Underscore Marketing's claim for purposes of Section 303(b). (*Id.* at 18–19.)

The Court does not find the Alleged Debtor's arguments compelling. According to the terms of the sublease agreement, the Alleged Debtor agreed to pay rent to Underscore Marketing "during the Term [of the lease] . . . **without any set-off, counterclaim, abatement or deduction whatsoever**[.]" (PC Ex. 7, p. 5 (emphasis added).) The Alleged Debtor also agreed that: "[the Alleged Debtor] shall not be allowed any abatement or diminution of Fixed Rent or additional

---

[11] The Court uses New York law since the sublease contains a choice of law provision selecting New York law as the controlling jurisdiction. (*See* PC Ex. 7, p. 19 ("This Sublease shall be governed by and construed in accordance with the laws of the state in which the Sublet Premises are situated, without regard to the conflicts of law principles thereof.").) It is undisputed that the Sublet Premises referenced in the sublease are located in New York.

rent under this Sublease because of Underlying Landlord's failure to perform any of its

obligations under the Underlying Lease." (*Id.* at 9.) Finally, the Alleged Debtor agreed that:

> This Sublease and all the obligations of [the Alleged Debtor] to pay Fixed Rent and additional rent and perform all of its other covenants and agreements hereunder shall in no way be affected, impaired, delayed or excused because [Underscore Marketing] or Underlying Landlord are unable to fulfill any of their respective obligations hereunder, either explicit or implicit, if [Underscore Marketing] or Underlying Landlord is prevented or delayed from so doing by reason of strikes or labor trouble or by accident, adjustment of insurance or **by any cause whatsoever beyond [Underscore Marketing]'s or Underlying Landlord's control**.

(*Id.* at 20 (emphasis added).) The terms of the underlying lease contain similar provisions

regarding the tenant's obligation to pay rent.[12] (*See id.*, Exhibit B, p. 7 ("Tenant shall pay the

Fixed Rent and Additional Rent when due without abatement, deduction, counterclaim, setoff or

defense for any reason whatsoever[.]"); pp. 53–54 ("This Lease and the obligation of Tenant to

pay Rental [sic] hereunder . . . shall in no way be affected, impaired or excused because

Landlord is unable to fulfill any of Landlord's obligations under this Lease, expressly or

implicitly to be performed by Landlord . . . if Landlord is prevented from or delayed in so doing

by reason of acts of God, casualty, strikes or labor troubles, accident, acts of war, terrorism,

bioterrorism . . ., governmental preemption in connection with an emergency, Requirements,

conditions of supply and demand which have been or are affected by war, terrorism, bioterrorism

or other emergency, **or any other cause whatsoever, whether similar or dissimilar to the

foregoing, beyond Landlord's reasonable control**[.]") (emphasis added).) Courts in New

York have routinely enforced comparable provisions. *See, e.g.*, *Williamsburg Climbing Gym

Co., LLC v. Ronit Realty LLC*, No. 1:20-cv-2073, 2022 U.S. Dist. LEXIS 2146, at *11–13

(E.D.N.Y. Jan. 5, 2022) (holding that "the force majeure clause and the clauses imposing upon

---

[12] The terms of the underlying lease are incorporated into the sublease and expressly modify same such that any reference to "Tenant" is construed to mean the Alleged Debtor. (*See* PC Ex. 7, p. 4.)

[the tenant] the duty to comply with government regulations and orders make clear that the parties foresaw the risk of unfavorable changes in governmental regulations, and allocated that risk to [the tenant]"); *Gap Inc. v. Ponte Gadea N.Y. LLC*, 524 F. Supp. 3d 224, 237–38 (S.D.N.Y. 2021) (enforcing force majeure provision in lease as a bargained-for term).

Based on the terms of the underlying lease and the sublease agreement, it is clear that the Alleged Debtor was obligated to pay rent and was not entitled to abatement despite its lack of access to the rented premises during the COVID-19 pandemic, an event clearly beyond the control of Underscore Marketing. Indeed, "[m]any New York courts assessing commercial lease disputes amidst the COVID-19 pandemic have held that the temporary and evolving restrictions on a commercial tenant's business do not warrant rescission or other relief based on the frustration-of-purpose doctrine[,]" or other legal theories. *NTS W. USA Corp. v. 605 Fifth Prop. Owner, LLC* (*In re NTS W. USA Corp.*), No. 20-cv-6692, 2021 U.S. Dist. LEXIS 171240, at *14–15 (S.D.N.Y. Sept. 9, 2021) (collecting cases); *see also Gap Inc.*, 524 F. Supp. 3d 224 (collecting cases) (declining to abate rent under the casualty provisions in the lease, the frustration of purpose doctrine, the impossibility defense, and failure of consideration and mutual mistake theories during the COVID-19 pandemic).

Despite these provisions in the lease and prevailing case law, the Alleged Debtor argues that paragraphs 24 and 33 of the sublease excused its obligation to pay rent during the COVID-19 pandemic or otherwise give rise to a counterclaim under the lease.

### a. Paragraph 24 of the Sublease Does Not Excuse the Alleged Debtor's Obligation to Pay Rent.

Paragraph 24 of the sublease states that:

If [the Alleged Debtor] shall be delayed in obtaining possession of the Sublet Premises because of delays in obtaining consent from Underlying Landlord or in construction or for any other reason outside the reasonable control of [Underscore

17

Marketing, Underscore Marketing] shall not be subject to any liability, the effectiveness of this Sublease shall not be affected and the term hereof shall not be extended, but the Fixed Rent shall not commence . . . until possession shall have been made available to [the Alleged Debtor].

(PC Ex. 7, p. 17.)

As the Southern District of New York has explained, "[u]nder New York law, 'a court must give full effect to unambiguous contract terms.'" *Delshah 60 Ninth, LLC v. Free People of Pa., LLC*, No. 20-cv-5905, 2022 U.S. Dist. LEXIS 116284, at *40 (S.D.N.Y. June 29, 2022) (quoting *HOP Energy, L.L.C. v. Loc. 553 Pension Fund*, 678 F.3d 158, 162 (2d Cir. 2012)). Thus, "words and phrases . . . should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions." *LaSalle Bank Nat'l Ass'n v. Nomura Asset Cap. Corp.*, 424 F.3d 195, 206 (2d Cir. 2005) (citations omitted). New York applies the rule of "ejusdem generis[; in other words,] the meaning of a word in a series of words is determined 'by the company it keeps.'" *Lead Lease* (*U.S.*) *Const. LMB Inc. v. Zurich Amer. Ins. Co.*, 136 A.D.3d 52, 57 (1st Dep't 2015) (quoting *People v. Illardo*, 48 N.Y.2d 408, 416, 399 N.E.2d 59 (1979)). "Moreover, it is a well-established principle of New York contract law that a contract should not be interpreted to produce a result that is absurd, commercially unreasonable, or contrary to the reasonable expectations of the parties." *Delshah 60 Ninth, LLC*, 2022 U.S. Dist. LEXIS 116284, at *40–41 (quoting *Aar Allen Servs. Inc. v. Feil 747 Zeckendorf Blvd LLC*, No. 13-cv-3241, 2014 WL 1807098, at *4 (S.D.N.Y. May 6, 2014) (internal quotation marks and alterations omitted)).

Contrary to the Alleged Debtor's argument that paragraph 24 of the sublease forestalls rent obligations during the lease term if the Alleged Debtor does not have access to the premises, the plain language of that provision only applies to circumstances delaying the Alleged Debtor's *initial possession* of the leased premises. Indeed, this provision states that if the Alleged Debtor

18

"is delayed in *obtaining* possession" of the premises, the obligation to pay rent will not "*commence* . . . until possession [is] made available" to the Alleged Debtor. (PC Ex. 7, p. 17 (emphasis added).) It is undisputed that the Alleged Debtor took possession of the leased premises in July 2019. (Doc. 325, pp. 99–100; *see also* PD Ex. 23.) Thus, the Alleged Debtor's *initial possession* and the obligation to pay rent *commenced* as of this date. Indeed, the Alleged Debtor paid rent for use of the premises from July 2019 until April 2020. (Doc. 325, pp. 75, 126.)

Were the Court to interpret this provision as the Alleged Debtor argues, it could conflict with the terms of both the sublease and underlying lease, which both state that rent will not be abated for any reason "beyond Landlord's reasonable control[.]" (PC Ex. 7, Exhibit B, pp. 53–54 ("This Lease and the obligation of Tenant to pay Rental [sic] hereunder . . . shall in no way be affected, impaired or excused because Landlord is unable to fulfill any of Landlord's obligations under this Lease . . . if Landlord is prevented from or delayed in so doing by reason of . . . **any other cause whatsoever . . . beyond Landlord's reasonable control**[.]") (emphasis added).) In light of New York courts' preference to give "words and phrases . . . their plain meaning," and to construe contracts "so as to give full meaning and effect to all of [their] provisions[,]" *Nomura Asset Cap. Corp.*, 424 F.3d at 206 (citations omitted), the Court finds that the Alleged Debtor's interpretation of paragraph 24 is inconsistent with the unambiguous terms of the contract. As such, the Alleged Debtor has not raised a bona fide dispute or contingency regarding Underscore Marketing's claim that it is owed rent from May 2020 until the end of the sublease term in June 2021.

The same is true for the Alleged Debtor's interpretation of paragraph 33 of the sublease.

**b. Paragraph 33 of the Sublease Does Not Excuse or Otherwise Offset the Alleged Debtor's Obligation to Pay Rent.**

Paragraph 33 of the Sublease states, in pertinent part, that:

[The Alleged Debtor] shall have the right to use the fixtures, furniture and equipment listed on Exhibit C . . . (the "FF&E") during the term of this Sublease. [Underscore Marketing] makes no representation or warranties regarding any of the FF&E or the condition thereof and [the Alleged Debtor] agrees to accept the FF&E in its "AS-IS" condition on the Commencement Date, subject to the terms hereof, except that the FF&E shall be delivered in working order. [The Alleged Debtor] shall keep and maintain the FF&E in substantially the same condition as it was delivered by [Underscore Marketing], reasonable wear and tear excepted, during the Term. Upon the expiration or earlier termination of this Sublease, [the Alleged Debtor] shall remove the FF&E from the Sublet Premises, which FF&E shall thereafter be the property of [the Alleged Debtor] for all purposes; **provided, however, in the event [the Alleged Debtor] shall then be in default under this Sublease beyond any applicable notice and cure period, [the Alleged Debtor] shall, at [Underscore Marketing]'s option, leave such FF&E in the Sublet Premises at the end of the Term** in the same condition as on the date hereof, reasonable wear and tear excepted.

(PC Ex. 7, pp. 21–22 (emphasis added).)

This provision in the sublease expressly states that the FF&E will convey to the Alleged Debtor *unless* the Alleged Debtor is in default under the terms of the sublease beyond any applicable notice and cure period. In such a circumstance, the Alleged Debtor contractually agreed to leave the FF&E "in the Sublet Premises at the end of the Term" at Underscore Marketing's option. (*Id.*) The Alleged Debtor admitted that it did not pay rent to Underscore Marketing from May 2020 until the end of the lease's term on June 29, 2021. While the Court has no evidence regarding whether Underscore Marketing opted for the Alleged Debtor to leave the FF&E in the Sublet Premises, Frydman testified that Underscore Marketing retained the FF&E at the end of the lease term.[13] Based on the Alleged Debtor's failure to pay rent for over a

---

[13] Curiously, Frydman also testified during the first phase of hearings in this case that "Deluxe Building Solutions, to my best knowledge, never, in its entire existence, owned any office furniture[.]" (Doc. 165, p. 206.) The Court finds

year, followed by the retention of the FF&E by Underscore Marketing, the Court finds that it is unlikely that the Alleged Debtor has any contractual right to the FF&E in the form of a counterclaim or other offset of rent. As such, the Court finds that the Alleged Debtor has not raised a bona fide dispute sufficient to give rise to a colorable counterclaim for Section 303(b) purposes.

Thus, the Court finds that Underscore Marketing has established that its claim for breach of contract based on the Alleged Debtor's failure to pay rent is not subject to a bona fide dispute or contingency as to liability on the Alleged Debtor's part for purposes of Section 303(b). Indeed, the Court finds, based on the record presented, that Underscore Marketing performed under the sublease, that the Alleged Debtor breached the terms of the sublease by failing to pay rent, and that Underscore Marketing is likely entitled to damages as a result for purposes of Section 303(b). *See Donohue*, 980 F.3d at 67. Based on the monthly rental amount as stated in the sublease, the Court finds that Underscore Marketing's claim is at least $16,750, plus interest at the contracted rate, and will be considered, along with the partial claim of Labanara, for purposes of the Court's Section 303(b) determination.[14]

---

that this testimony further belies the notion that the Alleged Debtor believed it was entitled to retain the FF&E under the terms of the sublease agreement.

[14] The Court is cognizant that Underscore Marketing has filed multiple proofs of claim in this case, alleging that it is owed anywhere from $161,740.97 to $269,493.71. (*See* Proofs of Claim 19-1; 19-2; 26-1; 26-2; *see also* Proof of Claim 26-2, Attachment 1 (claiming to be collectively owed $536,958.39).) However, at this stage, the Court need not determine the exact amount of Underscore Marketing's claim. Instead, it is sufficient to note that Underscore Marketing's claim satisfies the monetary requirements of 11 U.S.C. § 303(b)(1) in that such claim is at least $16,750 for Section 303(b) purposes.

**B. The Claim of Andreotti.**

Andreotti bases her claim on the Alleged Debtor's failure to pay her for "Development of [an] iBuilt End-to-End Platform Infographic."[15] (PC Ex. 36.) In support of her claim, Andreotti provided the Court with a copy of the design services agreement between herself and the Alleged Debtor, signed by Melissa Kalish ("Kalish"), Chief Marketing Officer, on November 13, 2020. (PC Ex. 36.) In addition, over various proofs of claim and during the hearings in this case, Andreotti provided copies of the work performed, email chains to employees within the Deluxe Group both before and after she completed her work, and an unsigned purchase order from the Alleged Debtor, among other documents. (*See* PD Ex. 15.) The Alleged Debtor disputes that a contract was ever formed with Andreotti, arguing that the unsigned purchase order cannot support her claim. (Doc. 327, p. 6.) In the alternative, the Alleged Debtor asserts that the design services agreement creates a dispute over which entity, if any, is indebted to Andreotti for the services she performed when considering the record as a whole. (*Id.* at 6–7.)

As with Underscore Marketing, to prevail on her claim, Andreotti must prove the following: "(1) an agreement, (2) adequate performance by the plaintiff, (3) breach by the defendant, and (4) damages." *Donohue*, 980 F.3d at 67 (quoting *Fischer & Mandell, LLP*, 632 F.3d at 799).[16]

---

[15] The Court notes that Andreotti has filed five proofs of claim in this case. (*See* Proofs of Claim 27-1; 27-2; 27-3; 27-4; 27-5.) The amount of her claim has remained constant at $5,000 throughout. However, the documentation she has provided in support of her claim has varied over each proof of claim.

[16] The Court uses New York law since the design services agreement contains a choice of law provision selecting New York law as the controlling jurisdiction. (*See* PC Ex. 36, pp. 3–4 ("The formation, construction, performance and enforcement of this Agreement shall be in accordance with the laws of the United States and the state of New York without regard to its conflict of law provisions or the conflict of law provisions of any other jurisdiction.").)

In its reply brief, the Alleged Debtor argues in a footnote that this choice of law provision, which also contains a forum selection clause, serves as a separate ground for this Court to dismiss Andreotti's claim under 11 U.S.C. § 305(a). (Doc. 334, p. 5 n.4.) Specifically, the provision states that:

**1. The Unsigned Purchase Order has No Legal Effect.**

The Alleged Debtor appears to argue that the unsigned purchase order attached to Andreotti's Proof of Claim number 27-4 should serve as the only contract in this case. (Doc. 327, p. 6.) However, the Court views this argument as puzzling since the purchase order is attached to an outdated Proof of Claim, and Andreotti no longer appears to rely on this document to support her claim. Indeed, Andreotti's most recent proof of claim, which controls, does not include the purchase order as an attachment. (*See* Proof of Claim 27-5.) To the extent that Andreotti continues to rely on this document or otherwise believes that it supports her claim, the Court finds that this document is of no legal effect by its terms. The purchase order states that "[m]utual approval of [terms & conditions] is required by Deluxe Building Solutions LLC[,]" and the terms and conditions that follow state that the purchase order will lapse if the document remains unsigned within 30 days of receipt by Andreotti. (Proof of Claim 27-4, Ex. 1, pp. 1–2.) It is undisputed that Andreotti has not produced a signed version of this document. Thus, the Court agrees with the Alleged Debtor that the purchase order is of no legal effect by its terms and cannot support Andreotti's claim.[17]

However, the Court finds that the lapse of this purchase order did not preclude Andreotti from entering into a separate and distinct legally binding contract with the Alleged Debtor

---

"In the event of a dispute arising out of this Agreement, the parties agree to attempt to resolve any dispute by negotiation between the parties. If they are unable to resolve the dispute, either party may commence mediation and/or binding arbitration[.] . . . . In all other circumstances, the parties specifically consent to the local, state and federal courts located in the state of New York."

(PC Ex. 36, p. 4.) The Court does not view this language as depriving it of jurisdiction to consider Andreotti's claim under Section 303(b). Indeed, at this preliminary procedural posture, the Court is not tasked with resolving the merits of Andreotti's claim or the dispute between the parties. As such, the Court will consider Andreotti's claim for its Section 303(b) analysis.

[17] The Court notes that this result is consistent with Frydman's testimony regarding the legal effect of unsigned purchase orders for T&P and Superior. (*See* Doc. 216, p. 134 ("[T]hey lapsed after 30 days and were void ab initio. So they have no value in terms of contractual or other rights.").)

23

untethered by the terms of the original purchase order.  Indeed, the Court finds that the design services agreement attached to Andreotti's most recent Proof of Claim and introduced as an exhibit during the hearings serves as such a contract.  (*See* Proof of Claim 27-5, Ex. 3.)

### 2. The Design Services Agreement Supports Andreotti's Claim for Payment Against the Alleged Debtor.

For Section 303(b) purposes, the Court finds that the design services agreement is a binding contract between Andreotti and the Alleged Debtor.  The agreement states that it is "between Michelle Matthews Andreotti ('Designer'), and Deluxe Building Solutions LLC ('Client'), for the performance of the design services, effective November 12, 2020."  (PC Ex. 36.)  The agreement also provided that "[i]n consideration for the Services to be performed by Designer, Client shall pay to Designer fees in the amounts and according to the payment schedule set forth in each executed [Scope of Work]."  (*Id.*)  Attached to the agreement is the scope of work, which provides for a one-time payment of $5,000 in exchange for the design work.  (*Id.*)  The scope of work also indicates that "one invoice will be issued on November 20, 2020[.]"  (*Id.*)  Andreotti testified that the agreement was drafted by the Alleged Debtor and signed by Kalish as the Alleged Debtor's Chief Marketing Officer.  (Doc. 319, p. 142 ("It was -- Deluxe Modular -- Building Solution's design services agreement, they provided the contract, and it was through Melissa Kalish, she was a CMO of Deluxe Building Solutions.").)  Indeed, the record establishes that Kalish was Andreotti's point of contact for this project throughout the contract term and beyond in her attempts to collect payment.

While the Alleged Debtor argues that Kalish was the Chief Marketing Officer for Deluxe Modular, rather than the Alleged Debtor, Doc. 327, p. 6, and that she was therefore unauthorized to sign the agreement on behalf of the Alleged Debtor, Kalish's employment agreement and Frydman's testimony undermine these assertions.  (*See* PC Ex. 169, p. 1; Doc. 325, p. 157.)

24

Specifically, Kalish's employment agreement states that: "This Employment Agreement is . . .

between DELUXE BUILDING SOLUTIONS, LLC, a Delaware Limited Liability Company (the

"**Company**"), . . . and **MELISSA KALISH** "**Employee**[.]" (PC Ex. 169, p. 1.) Frydman

confirmed during testimony that Kalish's employment agreement was with the Alleged Debtor

but elaborated that her employment was with "Deluxe Building Solutions on behalf of itself and

certain of its subsidiaries and affiliates identified as company parties." (Doc. 325, p. 166.)

However, Frydman's testimony about Kalish's position with the Deluxe Group was less than

clear:

> She's an individual who was the Chief Marketing Officer of Deluxe Modular and
> of -- one time Deluxe Solutions, and then after that, I think she moved over in
> September to iBUILT. She may have moved after that. And -- and -- so I'm seeing
> this agreement. I see that Melissa signed it. I'm not sure Melissa -- and it looks
> like she signed it as the Chief Marketing Officer; I don't know what. It might have
> been iBUILT, it might have been Deluxe Module, which is the group, but the -- you
> know, it says invoicing in a certain period of time. The invoices were to iBUILT.
> If you go up -- and she wasn't authorized to sign this to my knowledge, so maybe
> she's personally liable.

(Doc. 325, p. 157.) Thus, based on his testimony, it appears that Frydman was unaware of which

Deluxe Group entity Kalish worked for when she signed the design services agreement on behalf

of the Alleged Debtor. Such equivocal testimony regarding Kalish's authority to enter into the

design services agreement with Andreotti is insufficient to give rise to a bona fide dispute

regarding the existence of this agreement or Kalish's authority to sign it on behalf of the Alleged

Debtor. In the absence of a meaningful challenge from the Alleged Debtor as to Kalish's

authority to bind the Alleged Debtor, the Court finds that Kalish was an authorized agent who

was permitted to enter into the design services agreement with Andreotti for purposes of Section

303(b). Therefore, the design services agreement is enforceable by Andreotti against the Alleged

Debtor.

The record contains numerous emails from Andreotti to Kalish and others seeking payment for her design work.  (Proofs of Claim 27-4, 27-5; PD Ex. 15, 16.)  Andreotti also offered unrebutted testimony establishing that no payment was ever received.  (Doc. 319, p. 145.)  Indeed, the Alleged Debtor does not dispute this assertion.  In conjunction with the Court's finding that the design services agreement is enforceable by Andreotti against the Alleged Debtor, this evidence validates Andreotti's $5,000 claim against the Alleged Debtor for Section 303(b) purposes.

The Court is mindful of the Alleged Debtor's attempt to collaterally attack Andreotti's claim for payment by implicating various entities within the Deluxe Group in the transaction with Andreotti.  Specifically, it argues that the design services agreement contains Deluxe Modular letterhead, that the invoice submitted by Andreotti was addressed to Melissa Kalish as the Chief Marketing Officer for a separate entity within the Deluxe Group, and that the work Andreotti performed was for iBUILT, rather than the Alleged Debtor.  (Doc. 327, p. 6; Doc. 334, pp. 5–6.)  However, these observations do not alter the underlying payment obligation of the Alleged Debtor to Andreotti under the design services agreement.  Therefore, the Court finds that the Alleged Debtor's collateral attacks on the design services agreement do not create a bona fide dispute regarding its liability under same.

As a result, the Court concludes that Andreotti has established that her $5,000 claim for breach of contract based on the Alleged Debtor's failure to pay for her design services is not subject to a bona fide dispute or contingency as to liability on the Alleged Debtor's part for Section 303(b) purposes.  Indeed, the Court finds, based on the record presented, that Andreotti performed under the contract, that the Alleged Debtor breached the contract by failing to pay for the services performed, and that Andreotti is likely entitled to damages as a result for purposes of

Case 5:21-bk-00534-HWV    Doc 337    Filed 10/13/23    Entered 10/13/23 13:56:50    Desc
Main Document    Page 26 of 34

Section 303(b).[18]  *See Donohue*, 980 F.3d at 67.  Based on the terms of the design services

agreement, Andreotti's claim is $5,000 for Section 303(b) purposes.  It will thus be considered,

along with the claim of Underscore Marketing and the partial claim of Labanara, for purposes of

the Court's Section 303(b) determination.

Because the Court has found that Labanara, Underscore Marketing, and Andreotti hold

claims against the Alleged Debtor that are not contingent as to liability or the subject of a bona

fide dispute, and that such claims total at least $16,750 more than the value of the liens on the

Alleged Debtor's property for Section 303(b)(1) purposes,[19] the Court will not consider the

remaining Joining Creditors' claims.

### C. The Court will Decline to Abstain Under Section 305(a)(1).

In a footnote in its reply brief, and again in passing at oral argument, the Alleged Debtor

appears to argue that the Court should alternatively dismiss the instant case using the abstention

doctrine in 11 U.S.C. § 305(a).  The Court notes that the abstention doctrine is an extraordinary

remedy requiring the Court to balance the totality of the circumstances presented in the case

based on a multi-factor test.  *See In re AMC Investors, LLC*, 406 B.R. 478, 487–88 (Bankr. D.

Del. 2009) ("The courts that have construed § 305(a)(1) are in general agreement that abstention

in a properly filed bankruptcy case is an extraordinary remedy[.]"); *In re Mylotte, David &*

*Fitzpatrick*, No. 07-14109, 2007 Bankr. LEXIS 3572, at *13–18 (Bankr. E.D. Pa. Oct. 11, 2007)

(listing the seven "non-exclusive factors commonly considered" under 11 U.S.C. § 305(a)).

---

[18] As with Underscore Marketing, the Court makes no ruling on the merits of Andreotti's claim outside the context of Section 303(b).

[19] Indeed, the Alleged Debtor agreed that "if there are three qualifying creditors, and if the aggregate value . . . of their claims exceeds . . . $16,750," there is "no need to engage in a secured analysis of any kind." (Doc. 144, p. 36.)  The Court has found that Labanara, Underscore Marketing, and Andreotti collectively hold claims against the Alleged Debtor in excess of $16,750.  Therefore, the Court finds that these creditors' claims total at least $16,750 more than the value of the liens on the Alleged Debtor's property for Section 303(b)(1) purposes.

27

"The evidentiary burden is upon the party seeking dismissal or abstention under section 305(a)." *In re Mylotte, David & Fitzpatrick*, 2007 Bankr. LEXIS 3572, at \*17.

In light of the scant briefing and nearly absent argument on this issue, as well as the fact that "[a]n order under [Section 305(a)] dismissing a case . . . is not reviewable by appeal or otherwise by the court of appeals[,]" 11 U.S.C. § 305(c), the Court finds that the Alleged Debtor has failed to satisfy its evidentiary burden to present this issue before the Court. Indeed, the record presented is insufficient for the Court to consider any required factors fairly. *See In re Mylotte, David & Fitzpatrick*, 2007 Bankr. LEXIS 3572, at \*18. Moreover, from the record before the Court, it appears that abstention is likely inappropriate. Courts presented with the abstention issue under Section 305 have held that such jurisdictional restraint is improper where, as in this case, "there was no . . . state court liquidation procedure in place, [and] liquidation of the putative debtor's assets had not yet commenced." *Id.* at \*20–21 (collecting cases). Therefore, the Court will decline to dismiss this case on abstention grounds under 11 U.S.C. § 305(a)(1).

### D. The Alleged Debtor is Not Generally Paying its Debts as They Come Due Under Section 303(h).

The Court has found the Alleged Debtor has at least three qualifying creditors holding claims not contingent as to liability or the subject of a bona fide dispute totaling at least $16,750 more than the value of the liens on the Alleged Debtor's property for Section 303(b)(1) purposes. However, the Court must still determine under Section 303(h) whether the Alleged Debtor "is generally not paying its debts as such debts become due [as] a prerequisite to the entry of any order of relief." *In re VitaminSpice*, 472 B.R. at 296–97. Section 303(h) of the Bankruptcy Code states, in pertinent part, that

(h) [If the petition is timely controverted], after trial, the court shall order relief against the debtor in an involuntary case under the chapter under which the petition was filed, only if —

(1) the debtor is generally not paying such debtor's debts as such debts become due unless such debts are the subject of a bona fide dispute as to liability or amount[.]

11 U.S.C. § 303(h).

The Bankruptcy Code does not define the phrase "generally not paying," instead leaving the courts to interpret its meaning. *In re Petro Fill, Inc.*, 144 B.R. 26, 30 (Bankr. W.D. Pa. 1992). As explained by the Bankruptcy Court for the Eastern District of Pennsylvania,

Courts considering whether a debtor is generally not paying its debts consider several factors including the number of debts, the amount of delinquency, the materiality of nonpayment and the nature of the debtor's conduct of its financial affairs. [*In re Express Car & Truck Rental, Inc.*, 440 B.R. 422, 434 (Bankr. E.D. Pa. 2010)] (listing factors relating to "the 'generally not paying' standard in § 303(h)(1)"); [*In re Food Gallery*, 222 B.R. 480, 486–87 (Bankr. W.D. Pa. 1998)] (listing factors); [*In re Brooklyn Resource Recovery*, 216 B.R. 470, 481 (Bankr. E.D.N.Y. 1997)] (listing factors). The burden is on the petitioning creditors to establish by a preponderance of the evidence that the debtor was generally not paying its debts as they became due as of the petition date. [*Bartmann v. Maverick Tube Corp.*, 853 F.2d 1540, 1546 (10th Cir. 1988)]; *In re Petro Fill, Inc.*, 144 B.R. 26, 30 (Bankr. W.D. Pa. 1992); *In re Better Care, Ltd.*, 97 B.R. 405 (Bankr. N.D. Ill. 1989) (addressing whether petitioning creditors produced sufficient evidence to show debtor was generally not paying its debts).

*In re VitaminSpice*, 472 B.R. at 297. This inquiry is a fact-intensive one. *In re Express Car & Truck Rental*, 440 B.R. at 434; *see also In re Petro Fill*, 144 B.R. at 30 ("The relevant standard for determining whether or not an alleged debtor generally is paying its debts is not a mechanical one. Rather, it is flexible and involves consideration of the totality of the circumstances and requires balancing the interests of the alleged debtor against the interests of its creditors." (citations omitted)). As such, "[a] finding that a debtor is generally not paying its debts 'requires a more general showing of the debtor's financial condition and debt structure than merely establishing the existence of a few unpaid debts.'" *Liberty Tool, & Mfg. v. Vortex Fishing Sys.*,

29

*Inc.* (*In re Vortex Fishing Sys., Inc.*), 277 F.3d 1057, 1072 (9th Cir. 2002) (quoting *In re Dill*, 731 F.2d 629, 632 (9th Cir. 1984)).

In this case, the Court heard limited testimony regarding the Alleged Debtor's overall financial condition. However, based on this limited testimony, the Court concludes that the Alleged Debtor was generally not paying its debts as they came due.[20]

To begin, it is clear the Alleged Debtor faced significant debts when this case commenced. The original schedules filed in this case include a lengthy spreadsheet as an attachment containing the Alleged Debtor's creditors. (Doc. 22.) This spreadsheet lists scores of creditors with claims totaling just over $3.6 million. (*Id.* at 21–29.) Frydman testified that this spreadsheet came directly from the Alleged Debtor's records. (Doc. 165, p. 183.) The Court is aware that amended schedules supersede these schedules; however, the amended schedules contain what appears to be the same spreadsheet with an additional line item titled "Notes" indicating that the debts listed are "disputed, unliquidated and/or contingent." (Doc. 183, pp. 28–36.)

The Alleged Debtor appears to believe that its amended schedules with this additional notation should result in the Court concluding that all its debts are subject to a bona fide dispute as to liability or amount. Thus, the Court should determine that the Alleged Debtor's number of debts is zero for Section 303(h) purposes. (*Compare* Doc. 22, pp. 21–29 *with* Doc. 183, pp. 28–36.) This argument is not persuasive. A generalized line item on a spreadsheet indicating that the debt is "disputed, unliquidated and/or contingent" is insufficient to create a

---

[20] In evaluating the Alleged Debtor's financial picture, the Court does not consider the creditors whose claims the Court has determined are subject to a bona fide dispute as to liability or amount for purposes of Section 303(b). Despite removing these debts from the Court's consideration, the Court notes that many remain. Indeed, the Court has only evaluated the claims of seven total creditors in this case, which evaluation was limited to the Section 303(b) framework.

*bona fide* dispute regarding liability or amount as required by Section 303(h). Indeed, the Court

has not accepted such generalized allegations when conducting its Section 303(b) analysis. The

Court also finds this argument inconsistent with Frydman's testimony in this case, indicating that

the Alleged Debtor did not dissolve and continued to exist for the limited purpose of being "able

to collect on its receivables and its lawsuits, and **pay off whatever debts existed**." (Doc. 216,

p. 109 (emphasis added); *see also* Doc. 165, pp. 216–17.) It is clear that the Alleged Debtor

intended to repay its debts to the extent that it could—a sentiment inconsistent with the notion

that all of the Alleged Debtor's debts are "disputed, unliquidated and/or contingent."

Moreover, the Court finds that this sentiment contains an implicit admission from the

Alleged Debtor that it carried at least some debt burden it intended to repay when this case

commenced. When the schedules were prepared and filed, the Alleged Debtor's reported debts

appeared significant. Indeed, as indicated above, the Alleged Debtor's spreadsheets attached to

its schedules contain debts totaling just over $3.6 million, although the Court acknowledges this

figure is lower after removing debts the Court has already determined are subject to a bona fide

dispute or are otherwise contingent as to liability for Section 303(b) purposes.[21] (*See* Doc. 22,

p. 29.)

These debts become more significant when contrasted with Frydman's repeated

testimony that the Alleged Debtor was not doing business or operating in the ordinary course on

the date of the involuntary petition. (Doc. 165, pp. 163–64, 201 ("We were not doing business

on the date of the bankruptcy petition filing."); Doc. 216, pp. 99–104 ("[A]s I believe I testified

before, Deluxe Building Solutions, LLC ceased operating in January of 2021. So there was no

---

[21] The Court also recognizes that some percentage of this total debt burden is likely subject to valid disputes. However, it is difficult to believe that all or even most of the debts listed on the spreadsheet from the Alleged Debtor are subject to a complete defense that would entirely negate its payment obligation.

ordinary course of business going on at all with Deluxe Building Solutions as of the date of the filing of the bankruptcy.").)  In addition, Frydman consistently indicated that "[t]he reason we didn't dissolve Deluxe in January was in order to continue to collect . . . receivables, and then be able to pay whatever liabilities we could, and we honestly believed that there would be money available beyond that, but Deluxe had no money to operate."  (Doc. 165, pp. 216–17; *see also* Doc. 216, pp. 100, 109–10 ("And my expectation was that there would be additional funds beyond that of probably close to three and a half plus million dollars.").)  Absent normal operating funds, the Court finds that the Alleged Debtor was likely wholly reliant upon collecting receivables to pay its debts.[22]  Frydman indicated that the Alleged Debtor would "**continue**[] **to seek to collect** on litigation claims and other receivables."  However, it is unclear how consistently, if at all, the Alleged Debtor received payments on receivables.  (Doc. 216, p. 100.)  Indeed, Frydman testified that he was unsure if the Alleged Debtor made any payments after the Alleged Debtor ceased operations in the ordinary course.  (Doc. 216, pp. 99–101, 104.)

Based on the Alleged Debtor's schedules, the Alleged Debtor's primary source of revenue for debt service at the time this case commenced was a 50 percent interest in an anticipated $7 million litigation payout.[23]  (*See* Doc. 183, p. 17.)  The remainder of its receivables total just under $50,000 and are over 90 days old.  (*Id.* at 7.)  The Alleged Debtor's funding from its members, Winter and Frydco, had dried up, Doc. 165, pp. 216–17 ("the members of Deluxe were done, no one's writing anymore [sic] checks"), and any outstanding receivables were likely weeks, if not months or years away from realization at the time the

---

[22] The Court notes that the Alleged Debtor's schedules indicate that the Alleged Debtor had roughly $3,565.46 in liquid assets spread among three checking accounts at the time of the involuntary petition—an amount undeniably insufficient to pay all of the Alleged Debtor's debts as listed on its spreadsheets.  (Doc. 183, p. 6.)

[23] The Court notes that the figure reported here utilizes the amount requested in a complaint—a figure wholly speculative regarding what the actual recovery might yield for the Alleged Debtor and its creditors.

involuntary petition was filed. Therefore, it is clear to the Court that regular payments to creditors were virtually impossible as of the time of the involuntary petition because the Alleged Debtor had no source of income and almost no liquid assets from January 2021 until March 2021. Simply stated, the Court has not heard testimony or received evidence enabling it to believe that funds existed to pay the Alleged Debtor's debts after it ceased normal operations on December 31, 2020. Even if it were able or did make such payments, the Court finds that these payments would likely be small or inconsequential compared to the significant debt that the Alleged Debtor maintained.

Absent funds to make payments, the Court cannot conclude that the Alleged Debtor generally paid its debts for Section 303(h) purposes. The Court does not discount Frydman's testimony that the Alleged Debtor intended to collect its receivables and pay its debts; however, when the petition was filed, this intent was grounded on *future* income rather than present ability. As such, the Court finds that the Alleged Debtor was not generally paying its debts as they came due for Section 303(h) purposes.

Having established that the involuntary petition in this case satisfies the requirements of Section 303 of the Bankruptcy Code, the Court will deny the Motion to Dismiss.

## IV. CONCLUSION

For the foregoing reasons, the Court considers the claims of Underscore Marketing and Andreotti for its analysis under Section 303(b). Thus, in conjunction with the Court's first Memorandum Opinion, Doc. 268, the Court finds that the requirements of Section 303(b)(1) are met, and the Petitioning and Joining Creditors have standing to file the instant involuntary bankruptcy petition. The Court also finds that the Alleged Debtor is not generally paying its

33

debts as they come due under Section 303(h).  The Court will accordingly deny the Motion to

Dismiss.  An appropriate order will be issued.

By the Court,

Henry W. Van Eck, Chief Bankruptcy Judge
Dated: October 13, 2023